EILEEN P. BARRY, Independent Ex'r of the Estate of James Kevin Barry, Deceased, Plaintiff-Appellee, v. OWENS-CORNING FIBERGLAS CORPORATION, Defendant-Appellant.

First District (1st Division)   No. 1—94—2193

Opinion filed June 3, 1996.—Rehearing denied July 30, 1996.

John Dames and M. Jayne Rizzo, both of Kelley, Drye & Warren, and Ruth E. VanDemark and Ralph N. Galder, both of Law Offices of Ruth E. VanDemark, both of Chicago, and Karen I. Ward, of Granville, Ohio, for appellant.

Cooney & Conway, of Chicago (William R. Fahey, John D. Cooney, James Hopkinson, and Kathy Byrne, of counsel), for appellee.

JUSTICE WOLFSON delivered the opinion of the court:

In this appeal we are required to explore the boundaries of reasonable compensation in personal injury cases.

This is a wrongful death and survival action against Owens-Corning Fiberglas Corporation (OCF). The jury returned an itemized verdict that totalled $12,319,620.96. OCF attacks the verdict, contending that improper evidence, wrong jury instructions, and an unauthorized verdict form led to an award that is grossly excessive, not reasonably related to the evidence, and in contravention of public policy.

We take seriously OCF's contentions, but we do not agree with them. We affirm the judgment on the jury's verdict.

BACKGROUND

James Kevin Barry (Barry) was a journeyman insulator who had worked in the insulation trade since 1948. In July 1992, Barry began experiencing shortness of breath. He was diagnosed as having mesothelioma, a cancer of the lining surrounding the inside of the chest wall and the surface of the lung.

In October 1992, Barry sued OCF and 18 other corporate defen-

dants, claiming that he contracted mesothelioma from his exposure to asbestos-related products they manufactured.

Six months later, in April 1993, Barry died. His wife Eileen, as the representative of Barry's estate, became the plaintiff. The complaint was amended to add survival and wrongful death claims. Eileen and seven children were Barry's "next of kin."

Before trial, all defendants except W.R. Grace Co. (Grace) and OCF were dismissed, either because of settlements or the granting of summary judgment motions. After trial began, Grace settled, leaving OCF as the only defendant. The trial proceeded to the $12 million plus verdict being challenged in this appeal.

OCF contends several trial court errors contributed to the verdict, which reads:

> "We the jury find for the plaintiff, Eileen P. Barry, executor of the Estate of James Kevin Barry, and against the defendant Owens-Corning Fiberglass. We assess the following damages:
>
> For injuries to James Kevin Barry during the period that James Kevin Barry was alive, from July 13, 1992 until April 26, 1993: $4,638,430.96, itemized as follows:

| | |
|---|---|
| Medical Bills and Funeral Expenses | $138,430.96 |
| Disability | $300,000 |
| Disfigurement | $200,000 |
| Pain and Suffering | $4,000,000 |

> For loss of income/services as a result of the illness and death of James Kevin Barry. $331,190
>
> For loss of society to Mrs. Barry during the time period that James Kevin Barry was alive, from July 13, 1992 until April 26, 1993: $500,000
>
> For damages to the next of kin of James Kevin Barry as a result of the death of James Kevin Barry:

| | |
|---|---|
| Eileen P. Barry | $3,000,000 |
| Kevin Barry | $ 500,000 |
| Susan Barry Salmon | $ 500,000 |
| Margaret Barry Sheerin | $ 500,000 |
| Kathleen Barry Benz | $ 500,000 |
| Michael Barry | $ 500,000 |
| Daniel J. Barry | $ 600,000 |
| Erin P. Barry | $ 750,000 |

> [signatures of jurors]."

There was no line requiring the jury to reach a final figure. The

total award came to $12,319,620.96. Because of the settlements, the award was reduced to $11,000,120.96.

## OPINION

There is no issue here concerning the adequacy of the evidence to support the jury's finding of liability. Instead, OCF directs our attention to the jury's damages award. OCF contends various events at trial converged in the jury room to create an unconscionable verdict. We address those events.

## THE VIDEOTAPE

Over objection by OCF, the jury saw a 90-second videotape of a thorascopy procedure performed on Barry. The 90 seconds were excerpted from a 90-minute procedure performed by Dr. Roberts, a thoracic surgeon. He performed this diagnostic procedure to determine the cause of Barry's shortness of breath. Dr. Roberts testified at trial, using the videotape as a demonstrative tool to explain the procedure and the observations that led him to conclude Barry was suffering from mesothelioma. The videotape showed the fluid build-up in Barry's lungs which was causing the shortness of breath Barry was experiencing.

OCF argues that because the diagnosis of Barry's mesothelioma was not contested, the videotape was irrelevant, immaterial, or, at the very least, cumulative, and should not have been admitted.

■ Videotapes, like photographs, often are used as demonstrative evidence to provide a visual aid that will help jurors understand a witness' testimony. The videotape becomes, by its nature, cumulative to the testimony, but cumulative in a good way. The goal is to help the jury understand something. A videotape is admissible for that purpose if it fairly and accurately shows whatever it intends to show and if it is not unduly prejudicial. *Cisarik v. Palos Community Hospital*, 144 Ill. 2d 339, 579 N.E.2d 873 (1991).

If demonstrative evidence is inaccurate, or if it would tend to mislead or confuse the jury, it should not be admitted. See *Gill v. Foster*, 157 Ill. 2d 304, 626 N.E.2d 190 (1993); *Amstar Corp. v. Aurora Fast Freight*, 141 Ill. App. 3d 705, 490 N.E.2d 1067 (1986).

■ OCF does not say the videotape is inaccurate. We have seen it. We find nothing misleading or confusing in the tape. We do not agree with OCF's claim that the tape was submitted for its "dramatic effect and emotional appeal" rather than its demonstrative qualities. The carefully edited 90 seconds show Barry's diseased lung and the fluid build-up which was causing him distress. It tends to prove those matters.

There is nothing shocking or gruesome about the videotape. No blood flows. There is no gore. Fictional medical dramas on television regularly provide viewers with the sight of scalpels being inserted in various parts of the human anatomy. So does educational programming. No widespread public shock is discernible. It is most unlikely this jury was unduly influenced by this bland piece of videotape. It was not error to allow the jury to see it.

## LIFE EXPECTANCIES OF THE SPOUSE AND CHILDREN

The trial judge took judicial notice of mortality tables issued by the United States Department of Health and Human Services. He allowed the plaintiff to offer evidence of the life expectancies of Barry, his wife, Eileen, and the seven children. Later, the jury received Illinois Pattern Jury Instructions, Civil, No. 31.13 (3d ed. 1989) (hereinafter IPI Civil 3d). In it, the jury was told that in addition to Barry's life expectancy, it could consider the life expectancies of Eileen Barry and the seven children when assessing damages. The instruction read, in part:

"If you find for the plaintiff, then in assessing damages you may consider how long [each of the beneficiaries] will be likely to sustain pecuniary losses as a result of James Kevin Barry's death, considering how long James Kevin Barry was likely to have lived and how long [each of the beneficiaries is] likely to live." IPI Civil 3d 31.13.

IPI Civil 3d No. 31.13 then set out the life expectancies of people with the ages of James Kevin Barry at his death and each of the survivors at the time of trial.

OCF contends that where the deceased's life expectancy is less than the life expectancies of the survivors, allowing the jury to consider the life expectancies of the survivors is inappropriate, confusing, and misleading. In this case, says OCF, the error helped lead the jury to its unfortunately high verdict.

■ Wrongful death damages are intended to compensate the surviving spouse and next of kin for their pecuniary loss, including loss of society, resulting from someone's untimely death. *Simmons v. University of Chicago Hospitals & Clinics*, 162 Ill. 2d 1, 642 N.E.2d 107 (1994).

The period of time that matters is between the date the decedent actually died and the date he or she would have been expected to die had the defendant's wrongful conduct not intervened. As a matter of logic, if not law, the life expectancy of a survivor should come into play only if it is expected to be shorter than the life expectancy of the deceased.

Still, we do not see any harm done by the giving of IPI Civil 3d No. 31.13. The instruction is permissive. There is no reason to believe the jury was misled or confused by it. Certainly, the plaintiff did not tell the jury it should award money for years beyond Barry's life expectancy. OCF was free to, and did, without contradiction, argue to the jury that the relevant time period was the life expectancy of the decedent, not the survivors.

The only decision we have found that approaches the point is *Baird v. Chicago, Burlington & Quincy R.R. Co.*, 63 Ill. 2d 463, 349 N.E.2d 413 (1976). There, the parents of two deceased children sued the railroad under the wrongful death statute. The railroad complained that the instruction, Illinois Pattern Jury Instructions, Civil, No. 34.05 (2d ed. 1971) (hereinafter IPI Civil 2d), a predecessor to IPI Civil 3d No. 31.13, did not require that the pecuniary loss be determined on the basis of the life expectancy of the surviving parents instead of the longer life expectancy of the deceased children. In fact, the instruction there, as here, informed the jury of the life expectancies of both the deceased children and their surviving parents. The court held the instruction was not unconstitutionally vague, but went no further into the question raised in this case.

The damages instruction in the instant case adequately advised the jury of the proper elements of damages in the survival and wrongful death actions.

We cannot say that IPI Civil 3d No. 31.13, taken with all the other instructions, misled the jury or unfairly prejudiced OCF. See *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 273 Ill. App. 3d 977, 652 N.E.2d 1211 (1995).

■ OCF also complains about the failure to include the "present cash value" language in IPI Civil 3d No. 31.13. But OCF did not object to this omission during the instructions conference. In fact, there is reason to believe OCF asked for the omission. The record also shows OCF did not include this alleged error in its post-trial motion. The issue was not properly preserved for review. *Centracchio v. Rossi Construction Co.*, 170 Ill. App. 3d 1007, 524 N.E.2d 1000 (1988). We consider the matter waived.

There was no error in the giving of IPI Civil 3d No. 31.13.

## THE VERDICT FORM

In closing argument, the plaintiff's lawyer suggested a particular amount to be awarded in the wrongful death action to each of the survivors. The verdict form that was given, over objection, contained separate lines for each of the survivors.

OCF contends the trial court erred by allowing the jury to

determine the specific amounts to be awarded as wrongful death damages to each individual survivor. Relying on section 2 of the Wrongful Death Act (740 ILCS 180/2 (West 1992)), OCF contends the jury should have made a single award, which then would be distributed by the court in proportion to the survivors' percentage of dependency on the deceased.

■ Section 2 reads, in part:

"[T]he amount recovered in every such action shall be for the exclusive benefit of the surviving spouse and next of kin of such deceased person and in every such action the jury may give such damages as they shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such death, to the surviving spouse and next of kin of such deceased person.

***

The amount recovered in any such action *shall be distributed by the court in which the cause is heard* or, in the case of an agreed settlement, by the circuit court, to each of the surviving spouse and next of kin of such deceased person in the proportion, as determined by the court, that the percentage of dependency of each such person upon the deceased person bears to the sum of the percentages of dependency of all such persons upon the deceased person." (Emphasis added.) 740 ILCS 180/2 (West 1992).

Section 2 establishes the procedure to be followed whether the case is tried or settled. The statute clearly envisions a single jury award, with the judge who heard the case to distribute the money to the survivors based on a certain statutory formula. The jury is given no such guidance. The trial court distributes the money in the same way it would if the case had been settled. See *In re Estate of Williams*, 223 Ill. App. 3d 505, 585 N.E.2d 235 (1992); *Adams v. Turner*, 198 Ill. App. 3d 353, 555 N.E.2d 1040 (1990).

We find the clear language of the statute requires that jury awards and settlement amounts in wrongful death cases be treated the same way—distribution by the judge.

We conclude that the jury should not have received a verdict form which provided for individual awards to each survivor. However, all we are left with is speculation. We do not, of course, know how the jury determined the amounts it placed on the separate lines. We have no reason to conclude that the use of separate lines somehow inflated the total wrongful death award. We find no prejudice in the erroneous verdict form.

We note, too, there is no evidence in the record that OCF offered a different verdict form, without separate lines. A party ordinarily will not be heard to complain about a jury instruction unless it offers a proposed alternative. *Carlson v. City Construction Co.*, 239 Ill. App.

3d 211, 606 N.E.2d 400 (1992); *State Farm Fire & Casualty Co. v. Miller Electric Co.*, 204 Ill. App. 3d 52, 562 N.E.2d 589 (1990).

## THE AMOUNT OF THE DAMAGE AWARD

All errors aside, contends OCF, the damages award is grossly excessive. OCF asks that we grant a new trial on the damages issue, or, in the alternative, order a remittitur.

Barry was 59 years old when he died. The mortality tables say he would have been expected to live at least another 19.1 years. The testimony of his widow and seven children established that he had strong family ties and enjoyed close relationships with all of his children. The children, even those who were adults, kept in close contact with Barry. They saw each other regularly and depended on Barry's judgment and advice.

In the nine months from July 1992, when Barry was diagnosed, until his death in April 1993, Barry underwent several treatments for his cancer. First, chemotherapy was administered. This required his admission into the hospital for two 5-day sessions. During this time he was infused with certain chemical agents.

The chemotherapy, which caused nausea and vomiting, was unsuccessful. In addition, Barry was experiencing more pain due to a large growth on his left lung. He agreed to receive a treatment in which he was infused with "tumor necrosis factor," an experimental chemical agent, along with radiation.

The side effects from this second treatment included nausea and vomiting, as well as high fever, chills, body aches, rapid heart rate, and shortness of breath. Barry underwent this radiation treatment five days each week for a period of six weeks.

Barry experienced some relief from this treatment, but by February the tumor was growing again. It advanced into the abdomen, causing severe swelling from fluid build up. Radiation was no longer effective. The only treatment was to insert a long needle into the abdominal cavity to withdraw the fluid and to inject "tumor necrosis factor." This was done every few days. As much as a gallon of fluid would be removed.

Barry deteriorated rapidly at this point. He lost weight and became very weak. When treatment was no longer helpful, Barry was referred to the hospice program. Through this program, pain and sleep medication were administered to him at home to keep him as comfortable as possible.

OCF makes no specific attack on the elements that make up the survival action award, except that they are part of the complained-of total award. The survival action accounts for more than $5$^1$/2$ million

of the total, $4 million of it for Barry's pain and suffering during the nine months he suffered from the asbestos-related illness.

The wrongful death award was $6,850,000.

OCF asks us to compare the award in this case with those in other cases, especially asbestos-related cases. We decline to do so.

Comparisons are difficult, if not impossible, because each award depends on the facts and circumstances of that particular case. *Deerhake v. DuQuoin State Fair Ass'n*, 185 Ill. App. 3d 374, 541 N.E.2d 719 (1989). Exact mathematical computations cannot measure the propriety of jury awards. *Northern Trust Co. v. County of Cook*, 135 Ill. App. 3d 329, 335, 481 N.E.2d 957 (1985).

As we have said:

> "Defendant's attempts to establish the excessiveness of the award by comparing it to awards in other wrongful death cases is without avail. The propriety of such awards is not subject to exact mathematical computation and cannot be measured by comparison with other verdicts." *Drews v. Gobel Freight Lines, Inc.*, 197 Ill. App. 3d 1049, 1059, 557 N.E.2d 303 (1990).

We see no point to comparing this award to other asbestos-related cases. Juries are instructed to determine whether there is liability before they consider questions of damages. Once liability is found, the matter of compensatory damages has no logical relationship to the cause of the injury. That is a bedrock principle of our system of tort compensation. We are unwilling to find that there is any separate body of rules for asbestos-related cases. Establishing predictability of outcome for people similarly situated has surface attraction, but the courts of this state never have imposed on juries a requirement of conformity in damage awards.

What, then, is the standard we must use to determine whether a jury award may stand? The cases tell us a verdict should not be disturbed unless it is so large that it is the apparent result of passion or prejudice, or that it falls outside the limits of reasonable compensation. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 470, 605 N.E.2d 493 (1992); *Drews v. Gobel Freight Lines, Inc.*, 144 Ill. 2d 84, 94, 578 N.E.2d 970 (1991); *Phelps v. Chicago Transit Authority*, 224 Ill. App. 3d 229, 234, 586 N.E.2d 352 (1991).

Reviewing courts rarely disturb jury awards. For good reason. We are in no better position to judge the appropriate amount of a verdict than are the 12 people who see and hear the arguments and the evidence. They use their combined wisdom and experience to reach fair and reasonable judgments. We are neither trained nor equipped to second-guess those judgments about the pain and suffering and familial losses incurred by other human beings. To pretend otherwise would be sheer hubris.

There comes a point, of course, where judges must intervene. We do that when we are able to find from a particular record that passion or prejudice must have played a role in reaching the verdict, or that it was so grossly excessive that it may not stand as a matter of law. We are trained and equipped to do that. It is a responsibility we must accept.

Some of our cases say the test is whether the award is "so large as to shock the judicial conscience." See, for example, *Young v. Hummel*, 216 Ill. App. 3d 303, 310, 576 N.E.2d 1072 (1991). Whether that is a legitimate standard or pure hyperbole need not be decided in this case. We do observe that some judicial consciences are more easily shocked than others.

OCF contends the award in this case is so large it amounts to punitive damages, pointing in particular to the wrongful death damages. We do not agree.

Recently, our supreme court affirmed a $7.3 million verdict in a wrongful death and survival case, *Holston v. Sisters of the Third Order of St. Francis*, 165 Ill. 2d 150, 650 N.E.2d 985 (1995). There, the survivors were a husband and two children. Of the $6.2 million awarded in the wrongful death action, the husband received $1.2 million and the children each received $2.5 million. The court held the verdict was not excessive as a matter of law, nor did it result from passion and prejudice. Here, of course, we have surviving a wife and seven children. Simple mathematics tells us the verdict in this case does not run afoul of *Holston*.

OCF relies heavily on a federal case to support its view that this award cannot stand. But *Consorti v. Armstrong Worlds Industries, Inc.*, 64 F.3d 781 (2d Cir. 1995), does not help OCF. In *Consorti* the court applied the less deferential New York standard of whether the award "deviates materially from what would be reasonable compensation" to reduce a $12 million pain and suffering award to $3.5 million, not far from the $4 million in this case for Barry's pain and suffering. See N.Y. Civ. Proc. L. & R. § 5501(c) (McKinney 1995).

OCF asks us to look to the recent "tort reform" legislation, with its caps on noneconomic damages, for an expression of public policy that ought to apply to this case. The short answer is that there is no reason to believe such a public policy, whatever it is, existed at a time relevant to our consideration of this case.

■ We cannot set forth a litmus test that will establish the line between reasonable and unreasonable jury awards in all cases. We can say, based on the evidence and the applicable law, that the line was not crossed in this case. We will not vacate the award or order a remittitur.

The only other issue raised by OCF, the reading of former testimony of three experts, was not properly preserved in the trial court and will not be considered on review.

CONCLUSION
The judgment entered on the jury's verdict is affirmed.

Affirmed.

CAMPBELL, P.J., and BRADEN, J., concur.