NOTICE

Decision filed 09/09/08. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-06-0679

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| STEVEN A. BOREN, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellee, | ) Madison County. |
| | ) |
| v. | ) No. 01-L-786, consolidated with |
| | ) Nos. 00-L-886 & 01-L-289 |
| THE BOC GROUP, INC., ESAB GROUP, INC., | ) |
| LINCOLN ELECTRIC COMPANY, PRAXAIR, | ) |
| INC., SANDVICK, INC., TDY INDUSTRIES, INC., | ) |
| UNION CARBIDE CORPORATION, and | ) |
| VIACOM, INC., | ) Honorable |
| | ) Nicholas G. Byron, |
| Defendants-Appellants. | ) Judge, presiding. |

_____

PRESIDING JUSTICE STEWART delivered the opinion of the court:

The defendants appeal an order of the circuit court of Madison County granting a new trial in this cause. We affirm.

BACKGROUND

The plaintiff, Steven A. Boren, filed a complaint against multiple defendants, alleging that his Parkinson's disease was the result of his exposure to welding fumes and that the defendants failed to adequately warn of the neurological risks from manganese in welding fumes. When the parties first attempted to select a jury in May of 2005, the circuit court declared a mistrial when the parties agreed that an impartial jury could not be selected from the prospective jurors. On October 24, 2005, the parties appeared in court for a pretrial hearing prior to a second attempt at jury selection. The circuit court emphasized its concern for a fair trial, and it warned the attorneys as follows:

"The Court advised the entire [previous] panel that we had that the Plaintiff

1

had a right to be here and that the Defendants had a right to be here to defend themselves. And I might add that [Plaintiff's counsel] when asked by one of the potential jurors on the question of why is someone here from Cape Girardeau ***. Totally, totally improper, and he pursued it before I could make an effort to stop it. That will not happen this time. And you are not to pursue that line of inquiry. And then if there is someone here that wants to know about–that has some inclination to vent about tort reform, that is highly prejudicial. And we don't want to pursue that line, either. *** Both sides will get a fair trial in this case. It is a very important case. And as always, I'm a stickler about fair trials.

* * *

Neither side will be allowed to talk to the press given the tenor of some of the publications in this county and some of the newspaper articles in this county. I'm concerned here with a fair trial, and so I'm going to impose a restriction on all parties and counsel not to talk to the press except to say you're here, whom you represent, or some statistical information."

Prior to the trial, the circuit court granted several of Boren's motions *in limine*. The circuit court barred defense counsel from arguing that "[w]elding lawsuits, or plaintiff's claims, are 'lawyer-made' or 'cottage industry' lawsuits or claims, or that such cases are generated or caused by plaintiff's counsel." When the circuit court granted this motion *in limine*, defense counsel did not object, but he asked for clarification:

"MR. GLOOR [defense counsel]: [J]ust so I make sure I understand the scope of the Court's ruling, some of the studies that I believe the Plaintiffs are going to rely on were paid for by an entity called Gulf States Trial Lawyers. And so I don't want to be precluded from showing who funded a study that they're going to rely on. It states just that, too, in the first page of the study. I don't want to be precluded from

2

that.

THE COURT:  I don't think that would cover that.

MR. GLOOR:  I don't think that would cover it.  I just wanted to be sure.

THE COURT:  No.  If you have a study that is obviously influenced by some group, that comes out.

MR. GLOOR:  Thank you.

THE COURT:  If it is lawyers, obviously that would be admissible."

The parties selected a jury, and the trial began on November 1, 2005.  The trial consisted primarily of conflicting expert opinions.  During the trial, Boren testified that he began employment in the welding industry in 1976 and that he worked as a welder until he was diagnosed with Parkinson's disease in 1998.  Boren presented expert testimony that manganese in welding fumes from the defendants' products could have caused his Parkinson's disease.  The defendants presented expert testimony that there was no relationship between welding fumes and Parkinson's disease.

One of Boren's key experts, Dr. Nausieda, a neurologist who practices in Milwaukee, Wisconsin, testified that manganese can cause central nervous system disorders, such as Parkinson's disease, and that there is a link between welding and central nervous system disorders.

During the cross-examination of Dr. Nausieda, the defendants' attorney questioned him about the basis for his opinions, which included a "Gulf Coast study" in which he screened various welders from shipyards from the Gulf Coast states for Parkinson's disease.  Dr. Nausieda testified that he became involved in this Gulf Coast study at the request of a law firm in Louisiana.  The welders that were screened showed up at a union hall for their examination, and Dr. Nausieda testified that he did not know "exactly how they got there."  At that point during the cross-examination, defense counsel placed a picture of a full-size

3

billboard advertisement on the overhead screen for the jury to see. Defense counsel did not alert Boren's counsel that he was about to publish this billboard to the jury prior to doing so. In large letters, the billboard stated: "WELDING ROD INJURIES? call 1-800-INJURED Milwaukee." The billboard was not associated with Dr. Nausieda or the Gulf Coast study, and it was not related to Boren's diagnosis or to any of the lawyers or law firms involved in the present case. After the billboard was shown to the jury, the following dialogue took place:

"MR. McCOY [plaintiff's counsel]: Let me object to this advertising. This has nothing to do with anything in this case. It's nothing from our firm, Judge.

* * *

(The following was held in chambers[.])

THE COURT: I just want to point out that the pattern of inquiry has centered itself around this Gulf Coast, whatever it is. That's one thing for him to do the screenings down there and you get into that and tie that in, but your association with that and Bob McCoy[–]I'm going to have Bob make a record[;] I think we are at a mistrial at this point quite frankly, because I don't know how I can rehabilitate that jury in light of the fact that this county has been bombarded with adverse publicity[,] including the President of the United States himself[,] with how this county conducts the trial process. And with the bombarding of newspaper and the big advertising by the national–United States Chamber of Commerce[,] there's been, as we can see from the voir dire, an indoctrination of jurors generally, not only in this county, but throughout the United States[,] that there is something bad or wrong about trial lawyers. That borders[–]that line borders on great prejudice. Now, if you can tie it up.

* * *

4

THE COURT:  Up to now I have no problem until you plastered that thing on there.  Look, he's fair game for the Gulf Coast study[;] there's no question about it.  You got into it.  You show he's making $10,000 a day or whatever.  ***

*  *  *

MR. IVANSEK [defense counsel]:  He said on direct examination he did mention he saw an ad and the ad was from Mr. McCoy's law firm.

THE COURT:  That's fine.  You can cover that.  You can cover that[;] that's fair game.  You can ask him how much he paid him personally or his firm.  I got no problem with that.  But I do have a problem with that.

MR. GLOOR:  Okay.

MR. McCOY:  Just for the record[,] that lawyer billboard, which was the thing we just saw[,] that billboard on a highway picture is not from my firm or Keith Short's firm, has nothing [to] do with attracting lawyers to the Gulf Coast study.  That's been shown in this case.  And I've seen that board.  It's someplace up north in–north of Milwaukee, but that's not a board from my firm and not from Mr. Short's firm.  It's from some other lawyer and has nothing to do with this case.  The whole problem as your Honor pointed out is there is some inference being raised here that these cases are being solicited purely by lawyers.

THE COURT:  I'll advise the jury[;] you may preserve this for a new trial.  I'm not going to give you a mistrial.  I'll advise the jury.  You to [*sic*] get off this subject.  You are done with anything on the question of the Gulf Coast.  You covered it.

*  *  *

(The following was had in the courtroom in the presence of the jury[.])[]

THE COURT: Ladies and gentlemen of the jury, before you there was flashed a picture of some advertising regarding a solicitation or screening or whatever it was.

5

It was so fleeting I didn't get to see the whole thing, but you all saw it. That had to do with the coast, the Gulf Coast, is that correct?

MR. McCOY: No, it didn't have to do with the Gulf Coast. That's one of the problems[:] it didn't have to do with the Gulf Coast.

THE COURT: Well, you saw that. That advertising has nothing to do with Mr. McCoy and Mr. Short and their respective firms. You've been examined on the Doctor's association with the screening and the amount of monies he has made. That's the end of that line of inquiry."

On November 17, 2005, at the close of Boren's case, the circuit court granted a directed verdict in favor of one of the defendants, Hobart Brothers Company (Hobart). Boren did not challenge that ruling, and the trial continued with respect to the remaining defendants.

During closing argument, defense counsel, despite the circuit court's *in limine* order, made several references to welding lawsuits being a "cottage industry." In criticizing Dr. Nausieda, defense counsel stated to the jury: "It is a cottage industry, and we're the heavies. Let's see if we can get a jury to believe that Parkinson's disease is caused by welding." Defense counsel also stated the scope of "this cottage industry is a little scary." The claims against the remaining defendants went to the jury, and on December 1, 2005, the jury returned a verdict in favor of the defendants. On December 7, 2005, the circuit court entered a judgment on the verdict and on its previous order granting a directed verdict in favor of Hobart.

On February 6, 2006, Boren filed a motion for a new trial that raised several issues. Boren argued in his motion that during the trial defense counsel made inflammatory and prejudicial comments relating to frivolous lawsuits, which might have improperly influenced the jury's verdict. Boren took issue with defense counsel's use of the billboard advertisement

6

during the cross-examination of Dr. Nausieda. Boren also argued in his motion that defense counsel made improper comments during closing arguments. The circuit court conducted a hearing on Boren's motion for a new trial on May 18, 2006, and took the matter under advisement.

Before the circuit court ruled on the motion for a new trial, the defendants produced, in a federal multidistrict litigation, more than 457,000 pages of new discovery material that had not been produced in the present case. Included in the newly disclosed material was information revealing that, in the present case, the defendants had failed to disclose payments of approximately $600,000 toward several studies relating to welding fumes and central nervous system injuries. The studies were used by several key defense witnesses during their testimony that welding was not associated with increased frequency of Parkinson's disease.

On June 20, 2006, Boren filed a motion to reopen arguments on the motion for a new trial, alleging that the defendants' failure to furnish the documents impaired his ability to cross-examine key defense witnesses. The circuit court heard additional arguments on Boren's second motion on August 21, 2006, and the circuit court again took the matter under advisement.

On November 22, 2006, the circuit court entered the order granting Boren a new trial. It provided as follows:

"Two post[]trial motions by the plaintiff and hearings thereon have been conducted in this matter with extensive arguments and memoranda submitted by both sides. This court, in each instant, took the matter under advisement and has mulled over the serious issues presented. While the plaintiff's first motion created disturbing concerns in this highly volatile climate that the plaintiff was, indeed, prejudiced by the defendants' reference and inference that the plaintiff's attorneys were part of the

7

massive 'Bill Board' [*sic*] solicitation of prospective 'welding fume' victims in the south, when in fact they were not[,] this court does not feel that his reference was over[]come by its admonishment to the jury. The plaintiff had moved for a mistrial, which was then denied. Viewing all the evidence after the first motion, this court, never[]the[]less, felt some reluctance in disturbing its judgment at that point. However, with the submission of the second (subsequent) motion, it is the finding of this court that the defendant violated the rules of discovery, in failing to provide complete information to the plaintiffs, especially concerning Dr. Olanow, a key witness for the defendants[,] as required by statute. Complete discovery could well have been used to attack the impartiality of this witness and resulted in a different outcome.

This court notes that a [f]ederal [j]udge on that same issue of discovery fined the defendants heavily for failing to provide complete discovery.

In reviewing all the arguments, both written and oral, this court finds that both issues contended by the plaintiff to have been well taken.

Wherefore, this court adjudges, orders[,] and decrees that the judgment previously entered, herein, be and is hereby set aside and a new trial is ordered for the plaintiffs against the defendants."

On December 21, 2006, the defendants filed a petition for leave to appeal pursuant to Illinois Supreme Court Rule 306(a)(1) (210 Ill. 2d R. 306(a)(1)). On February 26, 2007, we granted the defendants' petition for leave to appeal.

DISCUSSION

"The decision of a trial court to grant a new trial is an exercise of discretion which should not be disturbed unless a clear abuse of that discretion is shown." *Ervin v. Sears, Roebuck & Co.*, 65 Ill. 2d 140, 144, 357 N.E.2d 500, 502 (1976). Reviewing courts defer

8

to the trial court's discretion because "the trial court has had the opportunity to consider the conduct of the trial as a whole[] and therefore is in a superior position to consider the effects of errors which occurred, the fairness of the trial to all parties, and whether substantial justice was accomplished." *Magnani v. Trogi*, 70 Ill. App. 2d 216, 220, 218 N.E.2d 21, 24 (1966). A trial judge's discretion is given deference because he is in a position to observe the trial attorneys' manner of speaking and the impact their comments had on the jury. *Harrison v. Chicago Transit Authority*, 48 Ill. App. 3d 564, 566, 363 N.E.2d 81, 83 (1977). We allow greater latitude to the circuit court in determining that a new trial is warranted than in denying a request for a new trial. *Magnani*, 70 Ill. App. 2d at 220, 218 N.E.2d at 24.

A reviewing court should not overturn an order granting a motion for a new trial "merely because the reviewing court would have reached a different result." *Lozado v. City of Chicago*, 279 Ill. App. 3d 285, 288, 664 N.E.2d 333, 334 (1996). Instead, "[a]n abuse of discretion will be found only where no reasonable person would take the view adopted by the trial court." *Keefe-Shea Joint Venture v. City of Evanston*, 364 Ill. App. 3d 48, 61, 845 N.E.2d 689, 701 (2005). On appeal, the burden is on the appellant to show that the circuit court abused its discretion (*Kerns v. Lenox Machine Co.*, 74 Ill. App. 3d 194, 196, 392 N.E.2d 688, 690 (1979)), and we believe that the defendants have failed to meet this burden in the present case.

The circuit court outlined several grounds for granting the new trial, and it considered the cumulative effect of the errors. The cumulative effect of errors may deprive a party of a fair trial, and in those circumstances, a new trial is necessary. See *Netto v. Goldenburg*, 266 Ill. App. 3d 174, 184, 640 N.E.2d 948, 956 (1994). Upon reviewing the record in the present case, we cannot say that the cumulative effect of the errors noted by the circuit court did not affect the verdict.

The circuit court's new trial order was based, in part, on the photograph of the

9

billboard advertisement that a defense attorney published to the jury. The circuit court ruled that the billboard advertisement was inadmissible and prejudicial. On appeal, the defendants argue that the billboard advertisement was admissible demonstrative evidence. We disagree.

A photograph is admissible if it has a reasonable tendency to prove a material fact in issue; it may be excluded if it is irrelevant or immaterial or if its prejudicial nature clearly outweighs its probative value. *Rusher v. Smith*, 70 Ill. App. 3d 889, 894, 388 N.E.2d 906, 910 (1979). In addition, demonstrative evidence is relevant only if its probative value outweighs the danger of unfair prejudice. *Carroll v. Preston Trucking Co.*, 349 Ill. App. 3d 562, 566, 812 N.E.2d 431, 435 (2004). The photograph of the billboard advertisement in the present case was not related to Dr. Nausieda's opinion that welding fumes can cause Parkinson's disease. It was not an advertisement related to the Gulf Coast study, and the billboard advertisement was not from any of the attorneys involved in the present case. The photograph, therefore, was irrelevant and immaterial.

The defendants argue that the billboard was relevant as demonstrative evidence because Dr. Nausieda admitted that his opinion was based in large part on information he gathered while participating in the lawyer-funded Gulf Coast screenings. When defense counsel questioned Dr. Nausieda concerning how welders arrived at the union hall for screening, the following dialogue took place:

"Q. In terms of the screening themselves, the people who came to the screenings[,] they were all referred to you by lawyers or those who worked with lawyers, correct?

A. I don't know that. They show up at a union hall and we examine them. Exactly how they got there[–]there seemed to be a multitude of routes by which one would end up at those evaluation sessions.

Q. One is advertising on TV, billboards, newspapers, things like that; is that

10

correct?

A.  Again, I've seen–certainly I've seen ads on TV, exactly who they are from I don't know.  Obviously that's one route."

Since Dr. Nausieda testified at the trial that he did not have personal knowledge of how people came to the screenings and had no personal knowledge of specific billboard advertising, a photograph of a billboard advertisement unrelated to Dr. Nausieda's study was not relevant and was not admissible.  The billboard advertisement did not have the tendency to prove a material fact in issue and did not serve as a visual aid to the jury in comprehending Dr. Nausieda's testimony.  "If demonstrative evidence is inaccurate, or if it would tend to mislead or confuse the jury, it should not be admitted."  *Barry v. Owens-Corning Fiberglas Corp.*, 282 Ill. App. 3d 199, 202, 668 N.E.2d 8, 11 (1996).  Because the billboard advertisement was unrelated to any of the testimony in the present case, it both was inaccurate and had the tendency to confuse the jury.

The defendants argue that the billboard advertisement was not prejudicial because of the circuit court's admonishment and because it was only seen by the jury for a brief period of time.  We cannot determine from the record how long the jury viewed the inadmissible photograph.  The circuit court was present when the billboard photograph was published to the jury, and the court had the opportunity to consider the conduct of the entire trial.  Although the circuit court described the presentation of the photograph as "fleeting," it did so only in front of the jury in its attempt to minimize the photograph's prejudicial effect.  By contrast, outside the presence of the jury, the court expressed significant concern about the jury viewing the billboard photograph.  In chambers, the circuit court stated, "I don't know how I can rehabilitate that jury in light of the fact that this county has been bombarded with adverse publicity \*\*\* with how this county conducts the trial process," and in its order granting a new trial, the circuit court did not feel that the prejudicial effect of the billboard

11

advertising was "over[]come by its admonishment to the jury."  The trial judge is in the superior position to assess and determine the effect of improper conduct on the part of counsel.  *Zuder v. Gibson*, 288 Ill. App. 3d 329, 338, 680 N.E.2d 483, 490 (1997).

We share the circuit court's concern that the use of the irrelevant billboard advertisement could have unfairly prejudiced the jury by encouraging the jury to decide the case not on the evidence, but on a general prejudice against lawyer-generated lawsuits.  "If it appears that demonstrative evidence was used for dramatic effect, or emotional appeal, rather than factual explanation useful to the reasoning of the jury, such use should be regarded as reversible error."  *Elder v. Finney*, 256 Ill. App. 3d 424, 427-28, 628 N.E.2d 393, 395 (1993).  The circuit court considered the billboard prejudicial, and we defer to the circuit court because "the attitude and demeanor of counsel, as well as the atmosphere of the courtroom, cannot be reproduced in the record."  *Bisset v. Village of Lemont*, 119 Ill. App. 3d 863, 865, 457 N.E.2d 138, 140 (1983).

We also note that the circuit court unintentionally compounded the error during its admonishment by incorrectly suggesting in front of the jury that the billboard was associated with Dr. Nausieda's Gulf Coast study.  As noted above, demonstrative evidence is not admissible if it had the tendency to confuse the jury.  *Barry v. Owens-Corning Fiberglas Corp.*, 282 Ill. App. 3d 199, 202, 668 N.E.2d 8, 11 (1996).  This incorrect comment by the circuit court highlights the confusing nature of the irrelevant billboard advertisement.

The prejudicial effect of the billboard advertisement was further compounded by defense counsel's violation of the circuit court's order barring defense counsel from referring to welding lawsuits similar to Boren's as being a "cottage industry."  The circuit court granted the plaintiff's motion *in limine* number 15, which barred defense counsel from arguing that "[w]elding lawsuits, or plaintiff's claims, are 'lawyer-made' or 'cottage industry' lawsuits or claims, or that such cases are generated or caused by plaintiff's counsel."

12

Defense counsel, nonetheless, made several references during closing arguments to welding claims being a "cottage industry".

A new trial may be granted for a violation of an *in limine* order if the order's prohibitions are specific, the violation is clear, and the violation deprived the moving party of a fair trial. *Kwon v. M.T.D. Products, Inc.*, 285 Ill. App. 3d 192, 198, 673 N.E.2d 408, 412 (1996). An improper insinuation during closing argument that violates an *in limine* order can be the basis for a new trial. See *Cancio v. White*, 297 Ill. App. 3d 422, 434, 697 N.E.2d 749, 757 (1998). The determination of whether improper argument should be the basis for a new trial is left to the sound discretion of the trial court. *Zuder v. Gibson*, 288 Ill. App. 3d 329, 338, 680 N.E.2d 483, 490 (1997).

In the present case, the circuit court's order was specific in its prohibition of the use of the term "cottage industry" to describe welding cases, and counsel's violation of the *in limine* order during closing arguments was clear. The violation compounded the prejudicial effect of the billboard advertisement, and together these errors played on general prejudices against lawsuits. The references to a "cottage industry" were directed at persuading the jurors to harbor disdain for welding cases in general and suggested that all such lawsuits were brought in bad faith by unscrupulous lawyers. See *Svoboda v. Blevins*, 76 Ill. App. 2d 277, 280-81, 222 N.E.2d 219, 221 (1966) (the plaintiff was granted a new trial where defense counsel insinuated unethical conduct on the part of the plaintiff's attorney in order to inflame the passions or arouse the prejudices of the jury). Defense counsel furthered this improper theme by stating as follows during closing argument: "If they find a welder who has any kind of a movement disorder, it's filed. I'm not just making it up." This comment was not supported by the evidence in the record, and it was an improper expression of personal opinion. See *Kerns v. Lenox Machine Co.*, 74 Ill. App. 3d 194, 198, 392 N.E.2d 688, 691 (1979).

13

Defense counsel's comments were prejudicial because they encouraged the jurors to disregard the evidence and find in the defendants' favor in order to remedy the social ills of frivolous lawsuits. The photograph of the billboard advertisement that defense counsel published to the jury also insinuated this theme. "The province of the jury is the resolution of factual issues in the narrow context of the case before them, not the rendering of moral or social judgments in verdict form." *Hansel v. Chicago Transit Authority*, 132 Ill. App. 2d 402, 407, 270 N.E.2d 553, 556 (1971).

The defendants argue that Boren waived his challenges to their closing arguments because he did not object when the comments were made. However, Boren's failure to make a contemporaneous objection during closing arguments does not preclude us from considering the comments in reviewing the circuit court's order granting a new trial. *Zoerner v. Iwan*, 250 Ill. App. 3d 576, 585, 619 N.E.2d 892, 900 (1993).

In granting a new trial, the circuit court also found that the defendants provided incomplete discovery disclosures. The circuit court found the defendants' discovery violation significant because Dr. Olanow was a "key witness" for the defense and "[c]omplete discovery could well have been used to attack the impartiality of this witness and resulted in a different outcome."

After Boren's trial concluded, the defendants produced, in federal multidistrict litigation, more than 457,000 pages of new discovery material that had not been previously produced in the present case. We cannot determine from the record whether Boren requested the defendants to produce all of these documents in the present case. The record does establish, however, that Boren had requested information concerning the defendants' funding for studies of neurological injuries to welders. Discovery disclosures of ESAB Group, Inc. (ESAB), and Lincoln Electric Company (Lincoln Electric) in the present case denied knowledge of the amount of funding they provided, and they did not identify specific

14

studies they funded. In the federal multidistrict litigation, however, these defendants disclosed payments of approximately $600,000 toward several studies that were used by key defense witnesses (including Dr. Olanow) in testifying that welding was not associated with increased frequency of Parkinson's disease. The record establishes that Lincoln Electric admitted to more than $296,000 of undisclosed funding for studies submitted for publication prior to the trial, and ESAB admitted to more than $294,000 in undisclosed funding.

The validity of various studies relied on by the various experts was a major issue of contention at the trial, and the undisclosed discovery information could have been used by Boren in challenging the defendants' evidence. The fact that the defendants' experts cited the funded studies as a part of the basis for their opinions makes the undisclosed information significant. The circuit court described Dr. Olanow as a key defense witness, and it was concerned that the new "discovery could well have been used to attack the impartiality of this witness and resulted in a different outcome." The circuit court did not abuse its discretion in finding that this discovery violation was prejudicial to Boren's right to a fair trial.

The defendants argue that newly discovered impeachment evidence cannot be the basis for a new trial. However, the defendants do not cite any authority that would prohibit a circuit court from considering a party's failure to disclose impeachment evidence, along with other misconduct, in granting a new trial where the cumulative effect of the multiple errors prejudiced the opposing party's right to a fair trial.

The circuit court has discretion to grant a new trial under the circumstances of the present case, considering the cumulative effect of the errors outlined above. It is the defendants who carry the burden on appeal to show that the circuit court abused its discretion. Viewing the record in its entirety and taking into account the trial court's superior position to weigh the effect of the errors on the jury, we cannot find that the circuit court

15

abused its discretion in finding that Boren's right to a fair trial was prejudiced. We cannot say that no reasonable person could take the view adopted by the circuit court.

The dissent maintains that our decision in the present case is inconsistent with *Elam v. Lincoln Electric Co.*, 362 Ill. App. 3d 884, 900, 841 N.E.2d 1037, 1051 (2005). We disagree. In *Elam*, we held that an attorney's inappropriate comments during closing arguments did "not rise to the level of prejudicial error" under the facts of that case. *Elam*, 362 Ill. App. 3d at 900, 841 N.E.2d at 1051. Our decision in the present case is not based solely on defense counsel's inappropriate comments made during closing arguments. Our decision is based on the several errors in the record discussed above and the cumulative effect of those errors noted by the circuit court. Because the record supports the circuit court's findings, we cannot hold that the circuit court abused its discretion, and we must affirm the circuit court's decision as we did in *Elam*.

CONCLUSION

For the foregoing reasons, we affirm the circuit court's order granting the plaintiff's motion for a new trial.


Affirmed.


GOLDENHERSH, J., concurs.


JUSTICE SPOMER, dissenting:

I respectfully dissent. I believe the trial judge abused his discretion, and I would reverse his order granting a new trial. See *Keefe-Shea Joint Venture v. City of Evanston*, 364 Ill. App. 3d 48, 61 (2005). It is clear from the November 22, 2006, order granting the new trial, which the majority quotes in its entirety above, that the trial judge based his ruling

16

solely on two issues: the "fleeting" display of the billboard photo and the purported discovery violation discovered after the trial.

With regard to the purported discovery violation, the judge based his ruling on the failure of the defendants "to provide complete information to the plaintiffs," reasoning that "[c]omplete discovery could well have been used to attack the impartiality of [Dr. Olanow] and resulted in a different outcome." The majority upholds this ruling by concluding that because the defendants' experts cited studies funded in part by the defendants, the "undisclosed" (slip op. at 15) exact amount of the funding by the defendants–in the neighborhood of $600,000–could have been used by Boren to challenge the impartiality of one of the defendants' key witnesses, Dr. Olanow. There are two major problems with this reasoning: first, there is no factual support for the proposition that any discovery violation occurred, and second, even if this court were to assume, *arguendo*, that there was a discovery violation, it is clear from the record that no prejudice to Boren resulted from the alleged violation.

The violation of discovery rules is a serious matter, and I agree with the Illinois Supreme Court that "discovery procedures are meaningless unless a violation entails a penalty proportionate to the gravity of the violation." *Buehler v. Whalen*, 70 Ill. 2d 51, 67 (1977). This court gives considerable deference to a trial judge's decision to impose sanctions for a discovery violation, and we will not reverse that decision absent an abuse of discretion. *Cirrincione v. Westminster Gardens Ltd. Partnership*, 352 Ill. App. 3d 755, 761 (2004). The predicate to our deference, however, is that the decision to impose sanctions is factually and legally informed and reasoned. *Cirrincione*, 352 Ill. App. 3d at 761. In this case it is neither.

The first problem with the reasoning of the trial judge, sustained by my colleagues in the majority, is that there is no factual support for the proposition that a discovery

17

violation occurred in this case at all. In the trial court and on appeal, Boren contends that disclosures made on April 20, 2006, in a case in Wisconsin are proof that a discovery violation occurred in this case. In the April 20, 2006, disclosures, defendant ESAB stated that it had provided approximately $294,000 in funding for epidemiological studies "relating to manganese in welding products or fumes or neurological problems in welders" conducted "between 2001 and 2005," and defendant Lincoln Electric stated that it had provided approximately $296,000 in funding for epidemiological studies "relating to manganese in welding products or fumes or neurological problems in welders" conducted "between 2001 and 2005." As noted above, the trial in this case took place in November and December 2005. At the hearing on his motion for a new trial, Boren provided no evidence that the information disclosed in the Wisconsin case on April 20, 2006, was available to the defendants at the time of this trial and thus could have been disclosed. In the absence of proof that the information was available to the defendants at the time of the trial in this case, I would not conclude, as did the trial judge and as does the majority, that a discovery violation occurred. Unsubstantiated conclusions argued by Boren's counsel are not sufficient.

A second and more troubling problem with the reasoning of the trial judge, sustained by my colleagues in the majority, is that even if this court were to assume, *arguendo*, that there was a discovery violation in this case, it is clear from the record that no prejudice to Boren resulted from the alleged violation. As the appellate court has stated, a trial court abuses its discretion when it grants a new trial on the basis of a discovery violation where the party aggrieved by the violation fails to show any prejudice resulting from the violation. *Tinsey v. Chicago Transit Authority*, 140 Ill. App. 3d 546, 549 (1986). That is because, as the *Tinsey* court pointed out, "the trial court's discretionary power must be exercised with great care, with a view toward achieving the goals of providing the parties with complete

18

discovery and a full trial on the merits," and the sanction of granting a new trial when the violation has not resulted in prejudice "is far out of proportion" to the gravity of the defendants' violation.  140 Ill. App. 3d at 549.

In the case at bar, I fail to see how the defendants' failure to disclose the exact amount of funding they provided to studies could reasonably be said to have prejudiced Boren's ability to challenge the impartiality of Dr. Olanow.  In the opening minutes of his testimony, Dr. Olanow stated that of the "maybe thirty, forty, fifty million dollars" in funding he had received during his career to fund his research, "some" of that funding was received from the welding industry, a statement that alerted the jury, at the outset of Dr. Olanow's testimony, that issues regarding his impartiality might exist.  Moreover, during direct examination Dr. Olanow also testified that his own study finding no link between welding fumes and Parkinson's disease had been funded by the welding industry and that he did not know who had funded the other nine studies finding no such link.  After discussing other studies that contrasted Parkinson's disease and manganism, Dr. Olanow testified that none of those studies had been funded by the welding industry.  He was specifically asked by defense counsel how long he had "consulted with people like myself in the welding rod companies," how much he charged per hour and per day to consult, and how much money he personally had received from the welding industry over the course of the 16 years he had been consulting on welding issues.  To this last question, Dr. Olanow testified that he had received "probably in excess of a million dollars," three-quarters of which was paid directly to him and one-quarter of which was used to fund his own study finding no link between welding fumes and Parkinson's disease.

On cross-examination, Dr. Olanow testified extensively about his early meetings with attorneys about the issue of welding fumes, during which time Boren's counsel repeatedly highlighted the fact that these attorneys represented the welding industry.  Dr. Olanow also

19

agreed that he had received approximately $1.25 million from the welding industry, a clarification of the amount "probably in excess of a million dollars" he had testified to on direct examination. Boren's counsel then reiterated the $1.25 million figure many times during the remainder of his cross-examination. Dr. Olanow also testified that his opinions were "derived based on the scientific data, not based on what a lawyer says," and that the funding he had received did not influence his opinions. He then testified extensively about various studies and study proposals, as well as the sources of funding for those studies and study proposals, indicating that attorneys for the welding industry had agreed to fund millions of dollars in studies, including at least $1.4 million to fund a study led by Dr. Carli Tanner. He was also examined extensively and in minute detail about studies that purportedly did find a link between welding fumes and Parkinson's disease, including the fact that those studies were not funded by attorneys. Moreover, he was questioned extensively about the necessity of disclosing potential conflicts of interest arising from sources of funding when submitting papers to scholarly journals, which led to attempts by Boren's counsel to imply that Dr. Olanow had failed to disclose conflicts of interest he should have disclosed. Throughout cross-examination, Boren's counsel was unable to get Dr. Olanow to renounce his conviction that there is no link between welding fumes and Parkinson's disease or to admit that he had ever acted unethically or failed to disclose a conflict of interest.

On redirect examination, Dr. Olanow again testified that his opinions were based on science and were not for sale, and he explained in detail the medical and scientific bases for his disagreement with studies that suggested a link between welding fumes and Parkinson's disease.

Against this factual backdrop, I fail to see how the defendants' failure to disclose the exact amount of funding they provided to studies could reasonably be said to have

prejudiced Boren. Boren's counsel was able to repeatedly inform the jury that the welding industry, via their attorneys, had funded the studies relied upon by the defendants' witnesses and to therefore cast doubt upon the objectivity of those studies, as well as of witnesses such as Dr. Olanow, using figures far in excess of the approximately $600,000 that defendants ESAB and Lincoln Electric had not specifically disclosed. I do not agree with the trial judge and the majority that knowing the exact amount that these defendants contributed to that funding could possibly have changed the outcome in this case. In light of this absence of prejudice, I believe that the judge's sanction of granting a new trial was far out of proportion to the gravity of the defendants' discovery violation–assuming, *arguendo*, that one occurred–and was therefore unreasonable.

With regard to the billboard issue, the judge noted in his order that he initially believed that his admonishment to the jury was sufficient to cure any prejudice that might have resulted from the "fleeting" display of the photo and that accordingly he had denied Boren's request for a mistrial on the basis of the display of the photo. Indeed, even after reviewing "all the evidence after the first motion," the judge "felt some reluctance in disturbing [his] judgment at that point." Comments made from the bench by the judge during the second hearing on the motion for the new trial reiterate the reluctance found in the judge's order. The judge's reluctance is not surprising in light of the fact that the Illinois Supreme Court has long held that a jury is presumed to have followed a judge's instruction to disregard improper evidence (see, *e.g.*, *McDonnell v. McPartlin*, 192 Ill. 2d 505, 535 (2000) (citing *People v. Taylor*, 166 Ill. 2d 414, 438 (1995)) and that where the exposure of the jury to improper evidence "was brief, [was] devoid of any specifics, and occurred during the course of lengthy and complex proceedings" and has been followed by a curative instruction, there are no grounds for a mistrial (*McDonnell v. McPartlin*, 192 Ill. 2d 505, 535 (2000) (citing *People v. Jones*, 123 Ill. 2d 387, 408-10 (1988)).

21

It was only after the judge became aware of the purported discovery violation that he reversed his position on the photo issue, found his previous admonishment to no longer be sufficient, and declared Boren's argument to be "well taken." Although the majority contends that this court "cannot determine from the record how long the jury viewed" the photo of the billboard (slip op. at 11), Boren–both in his motion for a new trial and in his brief on appeal–contends the photo was visible for "about one minute," the judge himself admitted the viewing was "fleeting," and as noted above this was a five-week trial. Given these facts and the cases cited above, I do not believe it to be reasonable to take the view that a discovery violation that was not proven to have occurred and that in any event did not prejudice Boren could nevertheless render insufficient a previously adequate admonishment on the entirely unrelated matter of the "fleeting" observation–encompassing about one minute during the course of a five-week trial–by the jury of a purportedly inadmissible photograph.

Although the majority contends that the defendants' reference in closing argument to welding lawsuits as a "cottage industry," in violation of the motion *in limine*, "compounded" the prejudicial effect of the billboard photo (slip op. at 12), it bears repeating that Boren did not object to any closing argument comments at the trial and did not object to the "cottage industry" comments in his motion for a new trial. Nor did Boren ever specifically mention the "cottage industry" comments during the May 18, 2006, hearing on his motion for a new trial. The record reflects that this phrase was mentioned in passing only twice during a two-hour-long closing argument. Accordingly, there is absolutely no evidence that the trial judge based his ruling in any part on the use of this phrase or even noticed that the phrase had been made. Because there is no evidence that the "view" taken by the trial judge in the order we are reviewing was based on the passing "cottage industry" comments made in closing argument, I do not believe that those comments warrant any consideration in our analysis

of whether that "view" was reasonable. Indeed, the majority itself states that it cannot conclude "that the cumulative effect *of the errors noted by the circuit court* did not affect the verdict." (Emphasis added.) Slip op. at 9. Had this issue been perceived as prejudicial by either Boren's counsel or the trial judge, surely there would have been an objection or admonishment.

If, however, the panel is to consider the comments, I would note that in a prior decision in our district, our court held that because "attorneys are allowed broad latitude in closing argument," even remarks that violate a motion *in limine* only warrant a reversal if the remarks prevented a party from receiving a fair trial. *Elam v. Lincoln Electric Co.*, 362 Ill. App. 3d 884, 900 (2005). The majority's holding in the case at bar is inconsistent with *Elam*. Like the comments in *Elam*–which was another welding case involving many of the same attorneys present here and which included sarcastic and derisive comments by counsel for the plaintiff to the effect that defense counsel were "Chicago lawyers" who would use "slick" tactics and "trick[s]" (362 Ill. App. 3d at 900)–I would find the unobjected-to remarks in this case to fall far short of prejudicial error.

I do not believe that it is reasonable to take the view adopted by the trial judge in his order granting a new trial. To the contrary, close scrutiny of the view adopted by the trial judge, and of the record as a whole, leads to the conclusion that the reasons given by the judge are insufficient and that the order really amounts to nothing more than an opportunity for a plaintiff who did not prove his case to have another bite at the apple. Accordingly, I would reverse the order. Because my colleagues have decided to do otherwise, I respectfully dissent from their decision.

23

NO. 5-06-0679

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| STEVEN A. BOREN, | ) Appeal from the |
| | ) Circuit Court of |
|     Plaintiff-Appellee, | ) Madison County. |
| | ) |
| v. | ) No. 01-L-786, consolidated with |
| | ) Nos. 00-L-886 & 01-L-289 |
| THE BOC GROUP, INC., ESAB GROUP, INC., | ) |
| LINCOLN ELECTRIC COMPANY, PRAXAIR, | ) |
| INC., SANDVICK, INC., TDY INDUSTRIES, INC., | ) |
| UNION CARBIDE CORPORATION, and | ) |
| VIACOM, INC., | ) Honorable |
| | ) Nicholas G. Byron, |
|     Defendants-Appellants. | ) Judge, presiding. |

_____

**Opinion Filed**:         September 9, 2008

_____

**Justices**:     Honorable Bruce D. Stewart, P.J.

                Honorable Richard P. Goldenhersh, J.,
                Concurs
                Honorable Stephen L. Spomer, J.,
                Dissents

_____

**Attorneys**
**for**
**Appellants**

Donald F. Ivansek, D. Patterson Gloor, The Gloor Law Group, LLC, 225 West Wacker Drive, Suite 1700, Chicago, IL 60606; Gordon R. Broom, Jeffrey S. Hebrank, Hepler Broom, MacDonald, Hebrank, True & Noce, LLP, 2 Mark Twain Plaza, 103 W. Vandalia Street, Suite 300, Edwardsville, IL 62025-0510

_____

**Attorneys**
**for**
**Appellee**

Robert G. McCoy, Jacqueline Herring, Vaughan Cascino Law Offices, Ltd., 220 S. Ashland Avenue, Chicago, IL 60607-5308

_____