RICHARD MARSTON, as Independent Adm'r for the Estate of Leonard J. Kulisek, Plaintiff-Appellee, v. WALGREEN COMPANY, Defendant-Appellant (Mia Crickman *et al.*, Intervening Plaintiffs-Appellees and Cross-Appellants; James Wilmes, Defendant; The Department of Human Services, Intervenor).

First District (2nd Division)   No. 1—07—0209

Opinion filed March 31, 2009.

Mayer, Brown, Rowe & Maw LLP (Michele Odorizzi, of counsel), and Johnson & Bell, Ltd. (Thomas J. Andrews and Michael C. Holy, of counsel), both of Chicago, for appellant.

David A. Axelrod & Associates, P.C., of Chicago (David A. Axelrod and Stacey L. Leinheiser, of counsel), for appellee Richard Marston.

S.C. Lucas Law Offices (Scott C. Lucas, of counsel) and R.D. Skelton, Ltd. (Richard D. Skelton, of counsel), and Law Offices of Lynn Dowd, of Naperville (Lynn D. Dowd, of counsel), for appellees Mia Crickman and Charles Kulisek.

National Association of Chain Drug Stores, Inc., of Alexandria, Virginia (Don L. Bell II, of counsel), *amicus curiae.*

Law Office of Lawrence R. Kream, LLC, of Chicago (Lawrence R. Kream, of counsel), for *amicus curiae.*

JUSTICE CUNNINGHAM delivered the opinion of the court:

In this personal injury, wrongful death, and survival action in October 2006, a jury found defendants Walgreen Company (Walgreen) and Walgreen's pharmacist, James Wilmes,[1] to have been negligent in providing the wrong prescription drugs to Leonard Kulisek, then 77 years old. This event occurred on January 1, 2001, at a Walgreen store in Schaumburg, Illinois. Kulisek suffered grave injuries and ultimately death.[2] Following trial, the jury awarded to plaintiff Richard Marston,

---

[1]Wilmes is not a party to this appeal.

[2]After Kulisek died during the course of pretrial proceedings, the complaints for wrongful death and survival were added to the complaint.

as independent administrator of Kulisek's estate, compensatory damages in the amount of $6,351,107, and $25 million in punitive damages. The trial judge then divided the punitive damages, allocating $100 to Richard Marston in his administrative capacity, $8,333,333.33 plus accrued postjudgment interest to plaintiff Marston's attorneys, and $16,666,566.67 plus postjudgment interest to the State of Illinois, Department of Human Services (the Department). This allocation to the State of Illinois was pursuant to section 2—1207 of the Code of Civil Procedure (735 ILCS 5/2—1207 (West 2006)), which gives the trial court the discretion, on its own motion, to apportion a punitive damages award among the plaintiff, the plaintiff's attorney, and the Department of Human Services of the State of Illinois. Walgreen appealed the judgment. After the apportionment had taken place, a cross-appeal from the allocation of the punitive damages was filed by Mia Crickman and Charles Kulisek (Mia and Charles), the niece and nephew of the decedent Leonard Kulisek. They were not parties to the original lawsuit, but were permitted by the circuit court to intervene as plaintiffs following the ruling on apportionment of the punitive damages. We have permitted the Department to intervene on appeal.

Walgreen's contentions on appeal are: (1) punitive damages for personal injuries cannot, as a matter of law, survive the death of the injured party; (2) even if punitive damages could legally have been awarded, Walgreen should have been granted judgment in its favor on that issue as a matter of law; (3) if the issue of punitive damages did not belong in the case, then a new trial on compensatory damages is required because of prejudicial evidence admitted solely because of and directly related to punitive damages; (4) Walgreen is entitled to a new trial because of numerous trial errors; and (5) the compensatory and punitive damages were excessive, in part, because the evidence failed to establish that some of the decedent's injuries were proximately caused by his ingestion of the wrong drug.

Intervening plaintiffs-appellees and cross-appellants Mia and Charles contend: (1) the trial court possessed jurisdiction to allow them to intervene as plaintiffs and cross-appellants; (2) they have standing to intervene; (3) punitive damages are permitted after the death of the plaintiff and were awarded in a proper total amount; (4) the punitive damages should not have been allocated in the manner done by the trial court but instead should have been awarded entirely to the plaintiff; (5) alternatively, the allocation should be vacated and the cause remanded to the trial court for a new allocation hearing regarding the punitive damages; and (6) the attorney fees awarded to plaintiff Marston's attorneys are excessive.

In response to these contentions by Mia and Charles, plaintiff

Marston, who does not challenge the allocation of punitive damages by the trial court, contends that the cross-appeal of Mia and Charles should be dismissed because the trial court lacked jurisdiction to entertain their motion to intervene and, further, they have no standing to intervene in the case or to participate in this appeal. He also contends that the allocation of punitive damages to his attorneys acting on behalf of Kulisek's estate was not excessive. Finally, the Department joins Marston in asserting that the cross-appeal by Mia and Charles should be dismissed because the trial court lacked jurisdiction to entertain their motion to intervene and also they lack standing to intervene. The Department defends the award of punitive damages and the allocation by the trial court. We affirm the judgment of the circuit court of Cook County on the award of compensatory damages, vacate the award of punitive damages, and dismiss the cross-appeal of Mia and Charles.

## BACKGROUND

Much of the evidence adduced from the record is undisputed. Walgreen has admitted liability based upon the actions of its pharmacist (James Wilmes) in erroneously filling a medication prescription for Leonard Kulisek. However, Walgreen disputes the extent of the injuries which resulted to Leonard Kulisek. Wilmes admitted that on January 1, 2001, he erroneously filled a prescription for Kulisek. The prescription was written for an anti-gout medicine called allopurinol. Instead, Wilmes gave Kulisek a bottle of pills labeled "allopurinol" but containing glipizide pills, a medication used to treat diabetes by lowering a person's blood sugar. Wilmes admitted that the two drugs were in completely different locations in the drug storage area and that he should have been able to distinguish between the two drugs. He offered no explanation for the mistake.

Walgreen and Marston agree that Kulisek was injured by this mistake, but they differ on the extent of the injury attributable to Kulisek's ingestion of the glipizide. Three physicians testified to Kulisek's health prior to this incident. They were his internist of 36 years, Dr. George Podzamsky; the plaintiff's medical expert Dr. Gary Toback, a board-certified nephrologist and an internist who practiced at the University of Chicago Hospitals; and the plaintiff's other medical expert Dr. Scott Kale, a board-certified internist practicing at Rush University Medical Center. They testified generally that Kulisek, who was 77 years old at the time of this incident, had been active and self-sufficient, with no significant medical problems preventing him from leading an active life. Dr. Toback testified that Kulisek did have mild kidney disease, chronic obstructive lung disease that caused occasional

shortness of breath but was relatively stable, prostate cancer that had apparently been successfully treated, and gout. But it was Dr. Toback's opinion that Kulisek was doing well and functioning at a level permitting him to participate in family and community activities.

On January 2, 2001, the day after Kulisek was given this prescription by Wilmes, and after he had taken two doses of the medicine, he became completely unresponsive. Paramedics were summoned to his home and found that Kulisek's blood sugar was extremely low. They gave him an intravenous solution of dextrose and took him to the emergency room at St. Alexius Medical Center in Hoffman Estates, Illinois. Kulisek was diagnosed as hypoglycemic (having low blood sugar). Emergency room physicians determined that this was caused by the glipizide which he had taken. They found the pills in a bottle labeled "allopurinol." Kulisek was admitted to the hospital and remained there until January 22, 2001. While there, he suffered acute kidney failure, persistent hypoglycemia, decreased mental functioning, and pneumonia. Because of his kidney problems he was placed on dialysis, which was to last until the end of his life. For the remaining 22 months of his life, Kulisek required full-time care. He underwent dialysis regularly, was hospitalized for 136 days, placed in a rehabilitation facility, had multiple surgeries, and required the insertion of a feeding tube. He suffered a stroke, had episodes of aspiration pneumonia, and became severely depressed. After leaving the rehabilitation facility on June 21, 2001, following his stroke, Kulisek required a caregiver 24 hours a day, 7 days a week. He required help in performing all activities of daily living, such as toileting and personal grooming. He could stand for only about five minutes at a time and had to use a wheelchair or walker for ambulation. He had difficulty speaking and continued to suffer from severe depression. On November 8, 2002, Kulisek directed that his dialysis be discontinued, telling a friend that he could no longer face life. He died on November 11, 2002.

The plaintiff's two medical experts, Dr. Toback and Dr. Kale, testified to a reasonable degree of medical certainty that the glipizide caused Kulisek's problems. They testified that the glipizide caused hypoglycemia, which then caused severe injury to Kulisek's kidneys, necessitating dialysis for the rest of his life. These doctors also testified, as did Walgreen's medical expert, Dr. LaPalio, that Kulisek was not suffering from symptoms of severe kidney disease before he took the glipizide.

The plaintiff's medical experts testified to three mechanisms by which hypoglycemia could have caused the kidney failure. Dr. Toback testified that low blood sugar deprives the kidneys of glucose, which is

crucial in order to maintain kidney function. This deprivation causes kidney cells to die and leads to kidney failure. A second possible mechanism for the severe injury to the kidneys was rhabdomyolysis, which is caused when an injured muscle releases the toxic protein myoglobin into the bloodstream. It was Dr. Kale's opinion at trial that Kulisek's ingestion of the glipizide provided the most reasonable explanation for Kulisek's development of rhabdomyolysis. The third possible mechanism for the kidney failure experienced by Kulisek was hypotension (abnormally low blood pressure). It was established that after ingesting the glipizide, Kulisek began displaying symptoms consistent with hypotension, including decreased appetite, confusion, dizziness, and loss of consciousness. Kulisek's nephrologist (kidney specialist), Dr. Tiu, also testified that he had been told by emergency personnel that Kulisek experienced a hypotensive episode while being transported to the hospital after the ingestion of the glipizide.

Both of the plaintiff's medical experts also testified that Kulisek suffered brain injury as a result of the glipizide-induced hypoglycemia. Dr. Kale testified that as a result of the brain injury Kulisek became depressed, experienced slurred speech, and had difficulty with mental processing. There was no objection by Walgreen to this testimony by Dr. Kale. Further, the testimony of Walgreen's experts, Dr. LaPalio and Dr. Quigg, was in agreement that hypoglycemia causes loss of consciousness, brain cell death and brain injury, and diminished ability to engage in mental processing.

It is undisputed that Walgreen's pharmacist, James Wilmes, who had been working for Walgreen for 17 years at the time of the occurrence, had for at least seven years prior to the occurrence, and almost one year thereafter, stolen drugs from Walgreen and ingested thousands of doses of controlled substances. In admissions to Walgreen's internal investigators and the police, Wilmes stated that in an eight-year period he had stolen and ingested numerous drugs, including Hydrocodone, Vicodin, Vicoprofen, Didrex, various forms of Oxycontin, Tylenol-3, codeine, and the stimulant Ritalin. In a signed statement Wilmes estimated that he had stolen and ingested 86,400 pills during the eight-year period. He also admitted that as a result of taking these drugs he could not practice his profession "with reasonable judgment, skill, or safety." In his testimony at trial Wilmes admitted that he had stolen and ingested various forms of Vicodin at the rate of eight or nine pills a day, but he could not recall if he had taken any on the day of the occurrence which gave rise to this lawsuit. He stated that he would steal and ingest drugs on 40% to 50% of the days he worked, to alleviate pain in his knees from bending down at work. He stated that he did not take drugs on days he did not work, and he

specifically denied having ever taken Oxycontin, although that drug was included in the earlier investigative report prepared by Walgreen's investigator based on Wilmes' statement. He also testified that he could not have taken anywhere near the 86,400 doses which he had previously admitted taking.

Testifying for the plaintiff, Dr. Robert Barkin, a pharmacologist with a doctorate in pharmacy and an associate professor of anesthesiology, family medicine, and pharmacology at Rush University Medical Center, testified that Wilmes' use of narcotics deprived him of the ability to make reasonable judgments. It was Dr. Barkin's opinion that Wilmes was chemically dependent upon controlled substances. Dr. Barkin also testified that Wilmes was not fit to be a pharmacist or a pharmacy manager.

For at least part of the time that Wilmes was stealing and ingesting Walgreen's drugs, Walgreen had in place a system for perpetual inventory of its drugs, which allowed it to keep a running tab of drugs added to its inventory and those which were dispensed. But at trial Walgreen employees testified that the company had no policies requiring that this perpetual inventory be scrutinized to prevent or detect the theft of drugs. Scott Diveny, a Walgreen pharmacy supervisor who discovered the inventory discrepancies which led to exposing Wilmes, testified that Walgreen failed to comply with federal and state provisions requiring it to keep a record of every single controlled substance that it disposed of, delivered, or sold. Walgreen did not preserve its records of inventory discrepancies, and therefore they could not be produced in response to plaintiff's discovery requests.

Walgreen did not discover that Wilmes was stealing and ingesting drugs at work until nearly a year after he gave the wrong medication to Kulisek. He was then fired.

Following the entry of judgment for plaintiff Marston and the allocation of punitive damages, and *10 days after defendant Walgreen had filed its notice of appeal*, the circuit court[3] allowed the "emergency" motion of Mia and Charles to intervene as plaintiffs for purposes of filing a cross-appeal challenging the allocation of punitive damages. This was done over the strenuous objection of plaintiff Mar-

---

[3]Judge Arthur L. Janura, Jr., who presided over the trial and most of the posttrial proceedings, retired. Thus, the emergency motion of Mia and Charles was presented to Judge Thomas L. Hogan on the morning of January 29, 2007. Judge Thomas L. Hogan in turn ordered that it be assigned for determination that afternoon by any available judge, and it was Judge Donald Suriano who heard arguments and allowed Mia and Charles's motion to intervene.

ston. The jury had determined that Mia and Charles, the only surviving relatives of the deceased, Leonard Kulisek, sustained no damages as the result of his death. However, Mia and Charles had entered into a prior agreement with plaintiff Marston which they contend entitles them to 40% of the jury award. Marston asserts that this agreement with Mia and Charles does not give them a right of intervention because it only creates contract rights independent of the lawsuit. Marston also asserts that Mia and Charles cannot claim a portion of the jury award from this lawsuit because assignments of personal injury actions are void as against public policy.

## ANALYSIS

■ We first consider Walgreen's claim that punitive damages are barred as a matter of law in a personal injury lawsuit where the injured party has died. Because this presents a pure question of law, we consider this issue *de novo*. *LaSalle National Bank v. Willis*, 378 Ill. App. 3d 307, 317, 880 N.E.2d 1075, 1083 (2007). Our supreme court has consistently held that, absent specific statutory authority or very strong equitable reasons, punitive damages are not permitted in Illinois in an action under the Survival Act (755 ILCS 5/27—6 (West 2000)) or as part of a common law action for wrongful death. *Ballweg v. City of Springfield*, 114 Ill. 2d 107, 117-18, 499 N.E.2d 1373, 1377-78 (1986); *Froud v. Celotex Corp.*, 98 Ill. 2d 324, 335, 456 N.E.2d 131, 136 (1983); *Mattyasovszky v. West Towns Bus Co.*, 61 Ill. 2d 31, 35-37, 330 N.E.2d 509, 511-13 (1975). *Froud* is of particular significance because there the court considered whether the holding of *Mattyasovszky* should be overturned. The *Froud* court very clearly reaffirmed *Mattyasovszky*, noting that the legislature had taken up and rejected a bill which would have amended the Survival Act to permit punitive damages to survive the death of the injured party. *Froud*, 98 Ill. 2d at 335-37, 456 N.E.2d 136-37. As to the exception noted in *Mattyasovszky* for cases where strong equitable considerations militate in favor of punitive damages, it is clear that the court was contemplating instances in which a party would otherwise be left without any remedy. The court cited to two such cases from other jurisdictions which allowed punitive damages or common law damages for wrongful death where a party would otherwise be left without any remedy. *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 401-02, 26 L. Ed. 2d 339, 357-58, 90 S. Ct. 1772, 1788-89 (1970) (although federal maritime law permitted punitive damages for deaths resulting from unseaworthy vessels, when the death occurred within the territorial waters of a state which did not allow such damages, the party would otherwise be left without a remedy); *Gaudette v. Webb*, 362 Mass. 60, 71, 284 N.E.2d 222, 229

(1972) (common law cause of action for wrongful death recognized where minor plaintiffs would have otherwise been barred from recovery because the statute did not toll the statute of limitations for minors). These cases crafted solutions in instances where there would otherwise be no damages remedy at all. But in the case before us, it is clear that the plaintiff was entitled to recover compensatory damages, and indeed more than $6 million for compensatory damages was awarded by the jury. Thus we do not find that an equitable resolution or remedy is required. The narrow exception referenced in *Mattyasovszky* is inapplicable to the facts of this case.

Plaintiff Marston relies primarily upon two Illinois Appellate Court cases (*Raisl v. Elwood Industries, Inc.*, 134 Ill. App. 3d 170, 479 N.E.2d 1106 (1985), and *Penberthy v. Price*, 281 Ill. App. 3d 16, 666 N.E.2d 352 (1996)), in support of his claim that punitive damages were appropriately awarded. Neither is appropriate and cannot support the award of punitive damages under these facts in light of the line of Illinois Supreme Court cases which clearly hold that punitive damages are not permitted in Illinois in an action under the Survival Act or as part of a common law action for wrongful death absent specific statutory authority or very strong equitable considerations. *Ballweg*, 114 Ill. 2d at 117-18, 499 N.E.2d at 1377-78; *Froud*, 98 Ill. 2d at 335, 456 N.E.2d at 136; *Mattyasovszky*, 61 Ill. 2d at 35-37, 330 N.E.2d at 511-13.

The court in *Raisl* held that punitive damages for retaliatory discharge under the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2006)) survived the death of the wronged employee even though not specifically permitted by that statute, noting that our supreme court has specifically held that actions for retaliatory discharge would only serve as a successful deterrent if punitive damages could be assessed against the employer. *Raisl*, 134 Ill. App. 3d at 175-77, 479 N.E.2d at 1110-11. This factor in *Raisl* was not the strong equitable circumstance contemplated by the Illinois Supreme Court. The *Raisl* court held that for reasons of equity and to protect the purpose behind the statutory scheme, punitive damages survived the death of the wronged employee. But in the case before us, there is no similar policy or pronouncement concerning the necessity of punitive damages to enforce a statutory scheme or to discourage the behavior of the defendants.

The compensatory damages award in this case demonstrates that there can be no question that an adequate remedy exists in that form of damages. We are also not persuaded by the reasoning of the court in *Penberthy v. Price*, 281 Ill. App. 3d 16, 21-22, 666 N.E.2d 352, 356-57 (1996), which held that death of the defendant in a personal injury

case arising out of a drunk-driving accident did not preclude an action for punitive damages against the driver's estate. The facts and holding in *Penberthy* are not helpful in guiding our analysis in the instant case and present nothing to fit the facts and circumstances in this case within the parameters set by our supreme court. We find that the plaintiff has presented no convincing argument to persuade us to deviate from strong Illinois public policy and established law, as repeatedly set out by our supreme court. Specifically, actions for punitive damages will not survive the death of the original plaintiff unless the legislature specifically authorizes such an action or there are strong equitable reasons for allowing the recovery of punitive damages. The circumstances of this case, which include an ample compensatory damages award in favor of the decedent's estate, do not fit the narrow exceptions to this principle.

■ We next consider whether there was sufficient evidence to support the compensatory damages awarded by the jury. Walgreen admits that the negligence of its pharmacist did cause injury to Leonard Kulisek. But it contends that the plaintiff failed to prove that the negligence, or the ingestion of the wrong medication by Kulisek, caused Kulisek's kidneys to fail or caused the ensuing need for dialysis, his mental deterioration, stroke and eventual death. In fact, the plaintiff presented overwhelming medical evidence of a cause and effect between Kulisek's ingestion of the glipizide and the onset of his subsequent medical problems. It was sufficient for the plaintiff to present expert testimony that, to a reasonable degree of medical certainty, ingestion of the glipizide was the proximate cause of Leonard Kulisek's problems. And the plaintiff in fact secured the testimony of two medical experts who testified that, to a reasonable degree of medical certainty, the glipizide caused Kulisek's medical problems. They testified that the glipizide caused hypoglycemia, which then caused severe injury to Kulisek's kidneys and his need for dialysis for the rest of his life. These experts also testified, as did Walgreen's medical expert, Dr. LaPalio, that Kulisek was not suffering from symptoms of severe kidney disease before ingesting the glipizide.

As discussed, the plaintiff's medical experts testified to three mechanisms by which hypoglycemia could have caused Kulisek's kidney failure. Walgreen suggests that these alternative theories were somehow improper and speculative. But a medical expert may testify to more than one possible cause of an injury, without specifically identifying the exact cause. *Bombagetti v. Amine*, 254 Ill. App. 3d 817, 821-22, 627 N.E.2d 230, 233 (1993). It is then for the jury to determine whether the evidence presented is sufficient to establish causation. *Bombagetti*, 245 Ill. App. 3d at 821-22, 627 N.E.2d at 233. Dr. Toback

testified that low blood sugar deprives the kidneys of glucose, which is crucial to maintaining kidney function. This deprivation can cause kidney cells to die and thus leads to kidney failure. A second possible mechanism for severe injury to the kidneys was rhabdomyolysis, which is caused when a muscle injury releases the toxic protein myoglobin into the bloodstream. Dr. Kale testified that Kulisek's ingestion of the glipizide provided the most reasonable explanation for muscle injury and his ensuing rhabdomyolysis. Again, an expert's testimony of causation in terms of probabilities does not render his testimony inadmissible; it merely presents a jury question. *Mikus v. Norfolk & Western Ry. Co.*, 312 Ill. App. 3d 11, 27, 726 N.E.2d 95, 108 (2000). The third possible mechanism for Kulisek's kidney injuries was hypotension (abnormally low blood pressure). After ingesting the glipizide, Kulisek began experiencing symptoms consistent with hypotension, including decreased appetite, confusion, dizziness, and loss of consciousness. Kulisek's nephrologist, Dr. Tiu, also testified that emergency medical personnel informed him that Kulisek experienced a hypotensive episode while being transported to the hospital after ingesting the glipizide. Walgreen objects to this latter testimony on the basis that it was hearsay and was revealed to it just two months before trial. But in fact it was Walgreen that introduced this evidence at trial through Dr. Tiu's evidence deposition, and accordingly, Walgreen cannot now complain of the admission of this evidence.

Both of the plaintiff's medical experts also testified that Kulisek suffered brain injury as the result of his glipizide-induced hypoglycemia. Dr. Kale testified that as a result of this brain injury Kulisek became depressed, experienced slurred speech, and had difficulty with mental processing. There was no objection by Walgreen to this testimony by Dr. Kale. Furthermore, Walgreen's experts, Dr. LaPalio and Dr. Quigg, were in agreement that hypoglycemia caused Kulisek to become unconscious, caused brain cell death and brain injury, and lessened his ability to process thought. Walgreen's objection amounts to an objection to the testimony of one of its own experts, Dr. LaPalio; thus we find that no prejudice occurred. We hold that there was ample evidence to support a finding for an award of compensatory damages.

■ Walgreen also asserts that the trial court erred when it gave the "short form" Illinois pattern jury instruction on proximate cause instead of the "long form." Of course a trial court's decision to give or not give jury instructions will only be disturbed if it is demonstrated that the trial court clearly abused its discretion. *Kramer v. Milner*, 265 Ill. App. 3d 875, 879, 639 N.E.2d 157, 160 (1994). The "short form" defines proximate cause as "a cause which, in natural or probable sequence, produced the injury complained of." Illinois Pattern Jury

Instructions, Civil, No. 15.01 (1995). The "long form" adds that proximate cause "need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury." Illinois Pattern Jury Instructions, Civil, No. 15.01 (1995). We are puzzled by this assertion of error, because it would appear that the long form would have more fully explained to the jury that the existence of more than one cause of injury would not preclude plaintiff from prevailing. In any event, Walgreen's argument is based on the claim that the causation instruction was critical because plaintiff's evidence of causation was "weak," a premise which we reject based upon our analysis of the evidence. We find no error in the giving of an instruction which could be said to have been more helpful to the defendant than to the plaintiff.

We have held that punitive damages could not be awarded in this case, where the injured party died during pretrial proceedings. Walgreen, however, also contends that the introduction of evidence relating to punitive damages was so prejudicial as to require a new trial on the issues of negligence and negligent supervision. But case law makes clear that where separate instructions and jury forms are given concerning issues relating to compensatory and punitive damages, no prejudice arises from the fact that after trial it is determined that punitive damages should not have been at issue. *Mattyasovszky*, 21 Ill. App. 3d at 55, 313 N.E.2d at 503; see *Kupianen v. Graham*, 107 Ill. App. 3d 373, 376-77, 437 N.E.2d 774, 775-76 (1982). Thus we find that no prejudice arose from the introduction of evidence concerning punitive damages, even though punitive damages were not appropriate in this case.

■ We next consider whether the award of compensatory damages was excessive. Unless a jury verdict is so large as to clearly establish that it was the result of passion or prejudice, it should not disturbed. *Barry v. Owens-Corning Fiberglas Corp.*, 282 Ill. App. 3d 199, 207, 668 N.E.2d 8, 14 (1996). There was ample evidence in this case of the grievous and ultimately deadly condition into which Leonard Kulisek was placed through the negligence and misconduct of Walgreen and its pharmacist, Wilmes. The amount awarded by the jury matched what the plaintiff requested of it. Where we are confronted with a man whose entire life was put into a downward spiral, which likely resulted in his decision to cease dialysis treatment, ultimately leading to his death, it borders on futility to compare the amounts awarded to other victims or their representatives in unrelated cases. We note, however, that similar amounts of compensatory damages have been awarded in other cases. *Barry*, 282 Ill. App. 3d at 207, 668 N.E.2d at 15 (uphold-

ing $6.85 million award, including $4 million for the decedent's pain and suffering during her last nine months of life); *Holston v. Sisters of the Third Order of St. Francis*, 165 Ill. 2d 150, 177-78, 650 N.E.2d 985, 998 (1995) ($6.2 million for wrongful death and $1 million for decedent's pain and suffering). Accordingly, we find no basis for altering the amount of compensatory damages awarded in this case.

■ Although the matter may well be moot because of our vacatur of the award of punitive damages, we also consider the contentions of the plaintiff and the Department that we should dismiss the appeal of intervening plaintiffs-appellees/cross-appellants Mia and Charles for lack of jurisdiction. As we have noted, over the objection of plaintiff Marston, Mia and Charles were allowed to intervene in this case on January 29, 2007, ten days after Walgreen had filed its notice of appeal. The sole purpose of their intervention appears to be so that they could appeal the distribution of the punitive damages. Arguments on this motion were heard by Judge Thomas Hogan and then by Judge Donald Suriano, to whom Judge Hogan assigned the matter. As we have noted, the judge who presided at the trial retired and so did not participate in these posttrial proceedings or in the decision to grant Mia and Charles' motion to intervene.

Section 2—408 of the Code of Civil Procedure requires parties seeking to intervene in an action to do so in a timely fashion. 735 ILCS 5/2—408 (West 2006). We have found no Illinois case permitting new parties to intervene in a trial court proceeding after a notice of appeal has been filed. When an appeal has been properly filed, jurisdiction attaches to the appellate court and the circuit court retains only very limited powers concerning the case. It may grant a stay (*In re Estate of Goodlett*, 225 Ill. App. 3d 581, 587, 588 N.E.2d 367, 371 (1992)) or enter an order which merely explains its prior order without substantively changing it (*Chavin v. General Employment Enterprises, Inc.*, 222 Ill. App. 3d 398, 405, 584 N.E.2d 147, 152 (1991) (trial court permitted to subsequently provide specifics of injunction order)). But allowing Mia and Charles' motion permitted them to raise issues not raised by Walgreen or plaintiff Marston, the parties who had actually participated in the litigation from its inception. Accordingly, we find that the trial court lacked jurisdiction to allow the motion of Mia and Charles, which substantively altered the nature of the appeal. This is particularly significant since Mia and Charles made their motion after the filing of the notice of appeal. We therefore dismiss the appeal of Mia and Charles and did not consider their briefs in resolving the legitimate issues raised by the true parties to this appeal.

Because we have vacated the punitive damages award, we need not address the remainder of the points raised by the Department.

For the reasons set forth above, we dismiss the appeal of intervening plaintiffs-appellees/cross-appellants Mia Crickman and Charles Kulisek, affirm the compensatory damages award entered by the trial court, and vacate the punitive damages award entered by that court.

Affirmed in part, vacated in part and appeal dismissed as to intervening plaintiffs-appellees/cross-appellants.

HOFFMAN and SOUTH, JJ., concur.