PATSY H. ADAMS, Indiv. and as the Adm'r of the Estate of Gilbert Adams, Deceased, Plaintiff, v. IAN TURNER *et al.*, Defendants (Patsy H. Adams, Petitioner-Appellee and Cross-Appellant; Katherine Poole *et al.*, Respondents-Appellants and Cross-Appellees).

Fifth District   No. 5—89—0447

Opinion filed May 9, 1990.

Raymond Lawler, P.C., of Marion, for appellants.

Barbara L. Woodcock, of Marion, for appellees.

JUSTICE HARRISON delivered the opinion of the court:

Katherine Poole and Deanna Young, the adult children of decedent, Gilbert Adams, appeal from an order of the circuit court of Williamson County which awarded them each $2,000 as their share of a $500,000 settlement obtained in the wrongful death action brought by the administrator of the decedent's estate, Patsy Adams. Adams was the decedent's second wife and the stepmother of Poole and Young. On this appeal, Poole and Young claim that their shares of the wrongful death settlement were disproportionately small because those shares did not accurately reflect the loss of their father's society which they experienced when their father was killed. They therefore request that their shares of the settlement proceeds be increased from $2,000 each to $36,227.60 each. Patsy Adams cross-appeals, arguing that Poole and Young were not entitled to even the $2,000 they each received. In Adams' view, Poole and Young should not have been permitted to share in the settlement proceeds at all. For the reasons which follow, we find that the circuit court did not abuse its discretion in distributing the settlement proceeds as it did. We therefore affirm.

The decedent, Gilbert Adams, was killed in a mine accident in 1986. Patsy Adams, his wife, was appointed the administrator of his estate. She filed a wrongful death action against defendants, Ian

Turner and N.E.I. Peebles, Ltd., pursuant to the Wrongful Death Act (Ill. Rev. Stat. 1985, ch. 70, par. 1 *et seq.*) to recover for the loss of "the society of decedent, including companionship, love, affection, care, attention, comfort, guidance, protection and support, which decedent would have provided but for his death." Following various developments not relevant here, the litigation was settled for $500,000, and the wrongful death action was dismissed.

Patsy Adams, as administrator of Gilbert Adams' estate, then petitioned the circuit court to "apportion and distribute" the proceeds of the wrongful death settlement. Stipulations were entered into regarding the workers' compensation lien held by the decedent's employer, Old Ben Coal Company; an evidentiary hearing was conducted; and legal memoranda were submitted to the court. Based upon the stipulations, evidence, and arguments of counsel, the circuit court held that the approximate present value of Patsy Adams' right to receive future workers' compensation benefits, calculated as of August 1, 1989, amounted to $162,276. The court noted that an annuity had been purchased for that amount which will pay Patsy Adams $1,500 a month for 17 years in 204 equal installments. Under the terms of the stipulations between Patsy Adams and Old Ben Coal Company, Old Ben was discharged and released from having to make any future workers' compensation payments to Adams after August 1, 1989.

The court also held: (1) that Old Ben Coal Company had an existing workers' compensation lien as of August 1, 1989, in the amount of $53,787.04; (2) that Old Ben should pay the estate's attorneys $46,726.37 in attorney fees pursuant to section 5 of the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.5) and reimburse those attorneys $7,060.67 as its share of the costs of the litigation; and (3) that the estate's attorneys should receive a fee of $74,950.67 and costs of $8,986.29 payable from the settlement proceeds.

After deductions were made from the settlement proceeds for the cost of the annuity, the payment of the workers' compensation lien held by the decedent's employer, and the attorney fees and costs of the estate's lawyers, $200,000 remained. Of this, the court awarded $196,000 to Patsy Adams. In support of its award, the circuit court found that Adams had sustained "a great loss of society and companionship" and that when decedent had died, Adams had lost her sole means of support. By contrast, the court found that the decedent's two adult children, Katherine Poole and Deanna Young, had not been financially dependent upon the decedent and that their contacts with their father had been sporadic and limited. Accordingly, it awarded

the two children the much more modest sum of $2,000 each.

From this judgment, Katherine Poole and Deanna Young have appealed, and Patsy Adams has cross-appealed. On these appeals, the sole dispute concerns the size of the shares of the settlement proceeds awarded to the daughters. The daughters claim they should have received more. Patsy Adams claims that they should have received nothing.

■ The division of an award in a wrongful death action is left to the circuit court's discretion. (*In re Estate of Flake* (1985), 137 Ill. App. 3d 535, 536, 484 N.E.2d 1243, 1244.) Accordingly, the question before us on review is whether the circuit court abused its discretion in apportioning the wrongful death settlement proceeds as it did. (See 137 Ill. App. 3d at 536, 484 N.E.2d at 1244; *In re Estate of Wiese* (1989), 178 Ill. App. 3d 938, 942, 533 N.E.2d 1183, 1185.) In determining whether a circuit court has abused its discretion, the issue is not whether the reviewing court agrees with the circuit court, but whether the circuit court acted arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted. (*In re Marriage of Aud* (1986), 142 Ill. App. 3d 320, 326, 491 N.E.2d 894, 898.) We do not believe that an abuse of discretion occurred in this case.

■ The Wrongful Death Act (Ill. Rev. Stat. 1985, ch. 70, par. 2), provides, in part:

"The amount recovered in any [wrongful death] action shall be distributed by the court in which the cause is heard or, in the case of an agreed settlement, by the circuit court, to each of the surviving spouse and next of kin of such deceased person in the proportion, as determined by the court, that the percentage of dependency of each such person upon the deceased person bears to the sum of the percentages of dependency of all such persons upon the deceased person."

■ ■ This statute has been interpreted to mean that where, as here, the claimants to the proceeds of a wrongful death settlement consist of the surviving spouse and the decedent's adult children by a prior marriage, the distribution of those proceeds must be determined on the basis of the proportionate percentages of their dependency on the decedent. (*In re Estate of Wiese* (1989), 178 Ill. App. 3d 938, 941, 533 N.E.2d 1183, 1185.) In the case before us, there is no dispute that neither of the decedent's adult daughters was financially dependent upon him. "Dependency," however, is not limited simply to financial dependency. It also includes loss of society. (178 Ill. App. 3d at 941,

533 N.E.2d at 1185.) Accordingly, an adult child may recover a proportionate share of the proceeds of a wrongful death settlement if she has sustained a loss of society, regardless of whether she was financially dependent upon the deceased parent. 178 Ill. App. 3d at 942, 533 N.E.2d at 1185.

■ Under Illinois law, adult children are entitled to a presumption of substantial pecuniary injury in the loss of their deceased parent's society. (*Cooper v. Chicago Transit Authority* (1987), 153 Ill. App. 3d 511, 518-19, 505 N.E.2d 1239, 1243-44.) Nevertheless, this presumption may be rebutted by contrary evidence. (153 Ill. App. 3d at 519, 505 N.E.2d at 1244.) In the face of contrary evidence, the presumption ceases to operate, and the trier of fact must base its decision on the actual facts and circumstances established by the evidence. See *Scheibel v. Groeteka* (1989), 183 Ill. App. 3d 120, 139-40, 538 N.E.2d 1236, 1249.

In the matter before us, considerable evidence was presented regarding the relationship between the decedent and his adult daughters and the loss of society which those daughters experienced when their father was killed. That evidence showed that the decedent had divorced the daughters' mother when they were quite young. The mother had custody of the daughters, and for many years they did not communicate with the decedent at all. As the daughters grew older, they reestablished contact with the decedent. As the trial court indicated in its judgment, however, their contact with decedent was sporadic at best.

The decedent and his daughters did not live particularly close to one another. He resided in Herrin, which is in Williamson County, while Deanna lived in Springfield and Katherine lived in St. Clair County. According to Patsy Adams, decedent's second wife, the daughters never called their father or sent him a card on his birthday. They rarely acknowledged him on Fathers' Day, and never sent him a Fathers' Day gift. Neither Deanna nor Katherine spent Christmas or Thanksgiving with the decedent, although they were invited to do so.

Katherine testified that she always attempted to see the decedent at some point during the holiday season. On the other hand, she stated that in the year or two prior to decedent's death, she saw the decedent only once. She claims that she lost touch with everyone during this period because she had had a nervous breakdown. Deanna, for her part, testified that her family would visit the decedent in Herrin "three or four times a year, at least."

The decedent was evidently quite fond of his grandchildren, the daughters' children. According to one of decedent's grandsons, "he

never missed our birthdays and we got Christmas cards and presents." The decedent also bought presents for Deanna and Katherine. Katherine testified that she had bought the decedent a knife which she intended to give him as a Christmas present before he died, but gifts to decedent from his daughters were evidently uncommon.

Deanna stated that she enjoyed decedent's company and was very upset when he was killed. She stated that the decedent would give her advice if she came to him with a problem and that he would comfort her. Paul Van Eckhout, a longtime friend of the decedent, recalled the relationship as being somewhat different. He remembered that "most of the time when [decedent] discussed the [daughters] he was angry at them." In his will, the decedent acknowledged his daughters, but left them nothing. Deanna understood that the decedent planned to change his will to make some provision for his daughters, but no new will was ever executed.

■ Under the Wrongful Death Act (Ill. Rev. Stat. 1985, ch. 70, par. 1 *et seq.*), calculation of the loss suffered by the decedent's survivors is not subject to mathematical determination. (*In re Estate of Flake* (1985), 137 Ill. App. 3d 535, 537, 484 N.E.2d 1243, 1245.) Translating the loss into dollar terms is particularly difficult where, as in the case of the decedent's daughters, the loss claimed is comprised exclusively of deprivation of the companionship, guidance, advice, love and other elements establishing "loss of society." These are abstract and elusive concepts which cannot be gauged simply by the number of gifts or greeting cards people have exchanged at holidays or the amount of time they have spent together. Still, there can be no real dispute that the relationship between the decedent and his daughters here was far from close.

■ On the other hand, we are mindful that the decedent and his daughters were emerging from a troubled history colored by a divorce which had resulted in their separation for many years. A reconciliation, belated though it may have been, was evidently underway. Tensions certainly remained. It is evident, however, that a very real bond existed between the decedent and his daughters. We must therefore conclude, as did the trial court, that the daughters suffered some compensable loss of society when their father was killed. Correspondingly, we must reject Patsy Adams' argument that the daughters were not entitled to any share of the proceeds of the wrongful death settlement.

Although the daughters did suffer a compensable loss of the decedent's society, their dependency upon him was negligible when com-

pared with that of the decedent's second wife, Patsy Adams. At the time of decedent's death, Adams had been married to him for 24 years. The record shows that theirs was a close and caring relationship. They traveled together, they spent their evenings together, and they shared hobbies, such as fishing and antique collecting. Although they had separate bedrooms, they remained sexually active.

Decedent made a substantial contribution to the upkeep of the household. He managed the household finances, he performed all of the repair work that was required, he helped clean house, and when Adams was still working, he would cook dinner for her.

Although Adams had held various jobs during the marriage, she stopped working in 1979 at her husband's request. After that time, the decedent was her sole source of support. Adams testified that whenever she needed money she would ask decedent for it and that he never turned down her request.

Because Adams' dependency upon the decedent was so complete, while the daughters' was so modest, we cannot say that the circuit court abused its discretion in limiting the daughters' share of the wrongful death settlement proceeds to $2,000 each. The judgment of the circuit court of Williamson County is therefore affirmed.

Affirmed.

LEWIS, P.J., and GOLDENHERSH, J., concur.