# Illinois Official Reports

## Appellate Court

---

### *Epstein v. Davis*, 2017 IL App (1st) 170605

---

| | |
|---|---|
| Appellate Court Caption | DAVID A. EPSTEIN, Public Administrator of Cook County, as Independent Administrator of the Estate of Marshana Philpot-Willis, Deceased, Plaintiff, v. PIXIE DAVIS, Individually and as Employee and Agent of One Hope United, Inc., ONE HOPE UNITED, INC., and LASHANA PHILPOT, Defendants (MARTELL WILLIS, JR., Petitioner-Appellant, v. CHARLES P. GOLBERT, Acting Public Guardian of Cook County, as Guardian of Lamariana Philpot-Willis, a Minor, Respondent-Appellee). |
| District & No. | First District, Sixth Division<br>Docket No. 1-17-0605 |
| Filed | December 15, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-1160; the Hon. Ronald F. Bartkowicz, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Law Offices of L. June Samuels, P.C., of Chicago (Laurie Samuels, of counsel), for appellant.<br><br>Robert F. Harris, Public Guardian, of Chicago (Charles P. Golbert, Kass A. Plain, and John David Jarrett, of counsel), for appellee. |

Panel
JUSTICE DELORT delivered the judgment of the court, with opinion. Presiding Justice Hoffman and Justice Connors concurred in the judgment and opinion.

**OPINION**

¶ 1     Seven-month-old Marshana Philpot-Willis died while her family participated in the "Intact Family Services" program of defendant One Hope United, Inc. (One Hope United). The Cook County public guardian[1] filed a wrongful death case on behalf of Marshana's estate to recover damages against One Hope United; its employee, Pixie Davis; and Marshana's mother, Lashana Philpot. See generally *Harris v. One Hope United, Inc.*, 2015 IL 117200. The estate settled the wrongful death action with One Hope United and Davis for $750,000. Following a hearing, the circuit court allocated 60% of the proceeds to Marshana's father, petitioner-appellant Martell Willis, Jr., and 40% to Marshana's sister, Lamariana Philpot-Willis. Willis appeals, contending that the court improperly denied certain motions he filed and that he should receive 100% of the settlement. We affirm.

¶ 2                                        BACKGROUND

¶ 3     Martell Willis, Jr., and defendant Lashana Philpot were the parents of two daughters who were born 10 months apart: Lamariana Philpot-Willis, born December 5, 2008, and Marshana Philpot-Willis, born October 17, 2009. On July 14, 2010, both daughters were placed unsupervised in a single "bath tote" while in their mother's care and while the family participated in a program administered by One Hope United. The younger daughter, Marshana, drowned in the bath tote while her older sister Lamariana was alongside her.

¶ 4     The public guardian of Cook County, which was named as independent administrator of Marshana's decedent's estate, filed the underlying wrongful death action. It was also appointed guardian of Lamariana's minor's estate.

¶ 5     The circuit court found the $750,000 settlement from One Hope United and Davis to be made in good faith, and the settlement was also approved by the probate court. The funds remained undistributed, pending a dependency hearing.

¶ 6     In 2015, Willis filed a petition seeking a determination pursuant to the Wrongful Death Act (740 ILCS 180/1 *et seq.* (West 2014)) of the relative dependencies of Marshana's family members. In the petition, he sought an allocation of 90% to himself, 10% to Lamariana, and 0% to the child's mother, Lashana.

¶ 7     On November 10, 2016, the court hearing Marshana's decedent's estate case granted the public guardian's request to withdraw both as administrator and attorney in that case because the dispute over the division of the settlement created a conflict between two of the heirs of the estate: Willis, the father, on the one hand, and its ward, Lamariana, on the other. That court resolved the matter by appointing the Cook County public administrator as successor supervised administrator of Marshana's estate.

---

[1]We have substituted Charles P. Golbert, acting public guardian of Cook County, in place of his predecessor, Robert Harris. 735 ILCS 5/2-1008(d) (West 2016).

¶ 8        On November 14, 2016, the circuit court substituted the public administrator of Cook County for the public guardian as plaintiff in the wrongful death case, and allowed the public guardian's attorneys to withdraw as counsel for the plaintiff. The public guardian, however, retained its previous appointment as guardian of Lamariana's minor's estate and its role as her counsel in the dependency hearing.

¶ 9        Willis orally moved for "recusal" of the public guardian, asserting that a conflict still existed and that a private guardian *ad litem* should be appointed for Lamariana. On November 16, 2016, the court denied the motions, finding that the conflict had been cured and that the only dispute then pending was between Willis, represented by private counsel, and Willis's daughter Lamariana, represented by the public guardian. The court also found Lashana, the girls' mother, in default and, after a prove-up hearing, entered a judgment against her for $100,000.

¶ 10       Willis also filed a third amended motion *in limine* requesting that the court bar presentation of, among other things, any evidence of the following at the hearing on his petition: (1) his criminal convictions; (2) his incarceration for a parole violation; and (3) any trauma suffered by Lamariana, as she was less than two years old at the time of her sister's death. On December 1, 2016, the court heard argument on the motion *in limine* and concluded that such a motion was more properly brought in a case heard by a jury. The court stated that since it would hear the evidence without a jury, it would reserve judgment on admission of particular evidence until it was presented and "exclude any testimony that I feel to be irrelevant."

¶ 11       On December 9, 2016, the circuit court conducted an evidentiary hearing on Willis's petition for allocation of the settlement. At the commencement of the hearing, Willis's attorney again requested a ruling on the motion *in limine*. The court responded: "No. We've gone beyond that. We talked about that." Eight witnesses testified, and the transcript of the hearing spans over 400 pages. We summarize the testimony most relevant to the issues presented in this appeal.

¶ 12       Willis testified that both daughters lived with him from October 17 to December 27, 2009, and for a few weeks in the spring of 2010. He observed no interaction between his daughters during that period. After December 27, 2009, the daughters lived with relatives for a few months. In late April 2010, Marshana was hospitalized for failure to thrive. After Marshana's discharge, both daughters were removed from their parents' household and placed in the custody of a relative due to a "safety plan." The children were returned to their mother Lashana in May 2010. Willis had relocated to Michigan but reunited with his daughters upon his return to Chicago. He remained with them until Marshana's death in July. During his testimony, he repeatedly emphasized that he did not observe the sisters interacting with each other.

¶ 13       Dr. Erika Gilyot-Montgomery, a clinical psychologist, testified that she conducted a social-emotional assessment on Lamariana. Although Lamariana is prone to tantrums and has a speech development problem, her overall development was satisfactory and she showed no particularly abnormal behavior or signs of trauma. She opined that children can "form attachments" at about the age of one year.

¶ 14       Anita Stewart, a social worker for the Chicago public schools, became involved with the sisters after Willis complained to the Department of Children and Family Services (DCFS) about the mother. She saw the girls about two to three times a week and noted that they exhibited typical "sibling rivalry" behavior and interacted by playing and hugging each other.

¶ 15 Belinda Warren, a DCFS investigator, testified that Lamariana was nurturing, caring, and concerned for her little sister. She observed Lamariana showing "genuine concern" by trying to hold Marshana's bottle to feed her.

¶ 16 Merlene Robinson-Parsons, Willis's aunt, testified that Marshana was released to her care upon her birth and that she cared for both girls for about three weeks. She is now Lamariana's guardian, and Lamariana has lived with her since Marshana's death. She observed Lamariana trying to hold her sister, and saw the two hug and kiss, and watch television and nap together. She believes that Lamariana was traumatized by her sister's death.

¶ 17 Bonnie Neuenschwander, a licensed clinical social worker, testified that she treated Lamariana for emotional concerns over the course of 14 months. Lamariana has indicated to her that she misses her sister. During play therapy, Lamariana would often place a doll baby in the bathtub of a dollhouse. While Neuenschwander does not believe that Lamariana suffers from post-traumatic stress disorder, she is at risk of it in the future. She opined that Lamariana was traumatized by her sister's death and recommended she receive continued therapy.

¶ 18 Joyce Hopkins, Ph.D., a licensed clinical psychologist, testified as an expert. Her specialty is the field of social and emotional development of children between birth and age five. She stated that young children retain memories of close relations from a very early age, even their first year of life. She also remarked that "trauma [including the loss of a sibling] in early childhood has major impacts on the developing neurological systems." Based on Lamariana's nightmares, her lack of language progress, and her comments that she missed her sister, Dr. Hopkins rendered an opinion, within a reasonable degree of scientific certainty, that Lamariana exhibited symptoms of traumatic stress disorder based on the loss of her sister. She also characterized Lamariana's placement of the baby doll in the dollhouse bathtub as a "classic manifestation of the trauma" by a child unable to express her feelings in words.

¶ 19 Following this hearing, the circuit court entered an order (1) finding that Lashana Philpot was the cause of death of Marshana Philpot "and in law and equity, therefore, cannot recover in this action"; (2) awarding Willis 60% of the balance of the wrongful death settlement; and (3) awarding Lamariana 40%, payable to the guardian of her minor's estate. The court stayed its order pending appeal.

¶ 20 Willis filed a motion to reconsider, which the circuit court denied on February 14, 2017. In its opinion denying reconsideration, the court particularly noted that it found the testimony of Parsons and Hopkins "persuasive" on the issue of the establishment of a relationship between the two sisters. Referring to the period when Marshana was alive as having a "tumultuous and often volatile family environment," the court stated: "If any relationship was being formed during this time, it was the bond between two sisters—regardless of their respective ages—in the face of unreliable parenting." This appeal followed.

¶ 21 On appeal, Willis contends that the circuit court erred by (1) denying Willis's motion *in limine* to bar certain evidence, (2) denying his motion to disqualify the Cook County public guardian from representing Lamariana's interests at the evidentiary hearing, and (3) allocating any of the settlement proceeds to Lamariana, in the absence of competent evidence of an established sibling relationship.

¶ 22 As a preliminary matter, we note the deficiencies in Willis's brief on appeal. The brief contains no appendix as required by Illinois Supreme Court Rule 342(a) (eff. Jan. 1, 2005). Accordingly, it contains no copies of the order appealed from, the opinions of the circuit court, or the notice of appeal. Most significantly, it provides no table of contents whatsoever to the

nine-volume, 1582-page record on appeal. Our rules require that appellants' briefs contain all of these materials. See Ill. S. Ct. R. 341(h)(9) (eff. Feb. 6, 2013); R. 342(a) (eff. Jan. 1, 2005). Supreme court rules are not mere suggestions; they are rules that must be followed. *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57. "Where an appellant's brief fails to comply with supreme court rules, this court has the inherent authority to dismiss the appeal." *Epstein v. Galuska*, 362 Ill. App. 3d 36, 42 (2005). In addition, this court may strike an appellant's brief for noncompliance with Rule 341. See *People v. Thomas*, 364 Ill. App. 3d 91, 97 (2006). Striking a brief or dismissing an appeal for failure to comply with supreme court rules is, however, a harsh sanction. *In re Detention of Powell*, 217 Ill. 2d 123, 132 (2005). Noting that the interests of a minor are at stake, and finding that Willis's lack of compliance with Illinois Supreme Court Rule 341(h) does not preclude our review, we will consider the merits of this appeal based on the brief presented. See *In re Estate of Jackson*, 354 Ill. App. 3d 616, 620 (2004) (reviewing court has choice to review merits, even in light of multiple Rule 341 mistakes).

¶ 23        We first address Willis's appeal regarding the denial of his motion *in limine*. A motion *in limine* is

> "[A] pretrial motion that seeks an order excluding inadmissible evidence and prohibiting questions concerning such evidence, without the necessity of having the questions asked and objections thereto made in front of the jury. Thus, the *in limine* order will protect the movant from whatever prejudicial impact the mere asking of the questions and the making of the objections may have upon a jury." *People v. Williams*, 188 Ill. 2d 365, 368 (1999) (citing *Reidelberger v. Highland Body Shop, Inc.*, 83 Ill. 2d 545, 549 (1981)).

In a bench trial, however, the court is presumed to have considered only competent evidence in making its findings. *People v. Tye*, 141 Ill. 2d 1, 26 (1990).

¶ 24        The record contains no particular written order specifically denying the motion *in limine*, but the parties extensively argued it, and it is clear the court did not find it to be meritorious. The court repeatedly emphasized that it did not wish to bar entire categories of evidence in advance, but instead wanted the parties to present evidence of their choosing at the hearing, subject to objection when the evidence was actually proffered. Since Willis's petition was heard by the court, rather than a jury, a motion *in limine* was an inappropriate mechanism to prevent the admission of the evidence he sought to bar. But more importantly, the section of Willis's appellate brief addressing the motion *in limine* consists only of argument and fails to cite a single case, statute, or legal authority. We therefore consider the issue forfeited. *Eckiss v. McVaigh*, 261 Ill. App. 3d 778, 786 (1994) (contentions supported by some argument but absolutely no authority do not meet the requirements of Rule 341).

¶ 25        Willis's second contention is that the court erred by denying his motion to disqualify the Cook County public guardian from representing Lamariana's interests at the dependency hearing. Willis's petition for determination of dependency was filed by private counsel who represented him throughout the evidentiary hearing and on this appeal. Orders were entered before the hearing substituting the public administrator for the public guardian as independent administrator of Marshana's decedent's estate. Willis asserts that the court entered these orders intending to resolve a conflict created when the public guardian decided to favor one heir (Lamariana) over another (Willis) at the dependency hearing.

¶ 26    In his brief, he cites ethics rules that prohibit attorneys from taking materially adverse positions to former and existing clients. Ill. R. Prof'l Conduct (2010) Rs. 1.7, 1.9 (eff. Jan. 1, 2010). He then pivots away from the realm of attorney-client ethics and states (without authority) the proposition that administrators of estates have a duty of impartiality to each heir of an estate. Relying on these principles, he contends that the public guardian violated its duties because it "obtained privileged and sensitive information about each of the heirs in its capacity as the independent administrator" of Marshana's decedent's estate and then used that information "to the disadvantage of an existing and *then former client Willis*." (Emphasis added.) Accordingly, Willis contends that the circuit court should have disqualified the public guardian from representing Lamariana's interests at the evidentiary hearing.

¶ 27    This logic suffers from several flaws. First, it improperly conflates the duties of an attorney to a client with the duties of an estate administrator to heirs or legatees. An attorney representing the administrator of an estate, even if the administrator is himself, represents the interests of the estate, not the heirs or legatees. As the court stated in *Gagliardo v. Caffrey*, 344 Ill. App. 3d 219, 228 (2003), "the beneficiaries of an estate are intended to benefit from the estate and are owed a fiduciary duty by the executor to act with due care to protect their interests," but "[t]hey are not, however, owed allegiance by the estate attorney, who does not have an attorney-client relationship with the beneficiaries and whose 'first and only allegiance' is to the estate in such adversarial situations." See also *In re Estate of Vail*, 309 Ill. App. 3d 435, 441 (1999) ("The attorney for the executor does not have an attorney-client relationship with the beneficiaries ***. When an adversarial situation arises, the attorney for the executor owes allegiance only to the estate."). An attorney indeed has a duty of loyalty to her clients, but for a duty to attach, there must be an attorney-client relationship. Willis's status as an heir to his daughter's decedent's estate did not establish any attorney-client relationship between him and the public guardian.

¶ 28    That still leaves the question of whether the public guardian breached any duty to Willis when it advocated at the evidentiary hearing for Lamariana to obtain a share of the estate at Willis's expense. The relationship between an estate administrator and a beneficiary of the estate is "fiduciary in character." *Stone v. Stone*, 407 Ill. 66, 77 (1950). But that fiduciary relationship does not extend to all affairs and transactions between administrators and beneficiaries. *Id.* Willis contends that when the public guardian became the estate administrator, he acquired a fiduciary duty to all heirs of the estate, a duty which prevented him from ever taking a position adverse to Willis in the future, even after he no longer served as estate administrator. Willis's argument on this point is confusing and not well developed. Other than a fleeting reference to the Illinois Rules of Professional Conduct, Willis's brief fails to cite any authority to support this contention of error. His vague references to unspecified "privileged and sensitive information *** including but not limited to depositions, agency case files, privileged juveniles files, etc.," without further explanation, render us unable to discern exactly what the public guardian may have done that breached some duty to Willis. Willis's brief fails to explain which, if any, of these items was actually used at the hearing or in any other way. Accordingly, we consider this issue forfeited, as well. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); see also *People v. Lane*, 2017 IL App (1st) 151988, ¶ 18 ("We will not attempt to divine the rationale behind defendant's undeveloped argument; defendant has forfeited this argument.").

¶ 29 Willis's third contention of error challenges the circuit court's allocation of 40% of the wrongful death proceeds to Lamariana. He requests that this court remand with instructions to award 100% of the proceeds to him.

¶ 30 Dependency hearings are creatures of statute established by the Wrongful Death Act (740 ILCS 180/1 *et seq.* (West 2014)). The purpose of the statute is to compensate the surviving spouse and next of kin for the pecuniary losses sustained due to the decedent's death. *In re Estate of Finley*, 151 Ill. 2d 95, 101 (1992). At a dependency hearing, the court must determine the relative dependencies of these parties. *Johnson v. Provena St. Therese Medical Center*, 334 Ill. App. 3d 581, 588 (2002). We review a dependency allocation for abuse of discretion. *Adams v. Turner*, 198 Ill. App. 3d 353, 356 (1990). We may reverse the court's dependency determination only if no reasonable person could agree with it. *In re Adoption of D.*, 317 Ill. App. 3d 155, 160 (2000).

¶ 31 The Wrongful Death Act does not define the term "dependency." However, case law establishes that the term connotes, in part, the support obtained by a party from a previously existing relationship with the deceased. *Johnson*, 334 Ill. App. 3d at 592. Also relevant is loss of society, which includes the "companionship, guidance, advice, love, and affection" formerly offered by the decedent. (Internal quotation marks omitted.) *Williams v. Rush-Presbyterian St. Luke's Medical Center*, 387 Ill. App. 3d 77, 83 (2008).

¶ 32 Recognizing that a sibling relationship may "often times [be] extremely significant," our supreme court has held that, where a sibling is next of kin under the Wrongful Death Act, the sibling may recover pecuniary damages for "deprivation of the companionship, guidance, advice, love and affection of the deceased." (Internal quotation marks omitted.) *Finley*, 151 Ill. 2d at 103-04. However, "simply because the parents and the siblings of the decedent may both suffer legally cognizable pecuniary injury which may include loss of society, it does not necessarily follow that both the parents and the siblings will be treated alike for purposes of the application of a presumption of loss of society." *Id.* at 104. An individual may recover for loss of a deceased brother or sister, but the individual's damages are not presumed and must be proven. *Id.* Even in the absence of evidence of direct testimony establishing a relationship between the deceased and siblings because of the deceased's severe disabilities during his life, loss of society may be established through such things as visiting the deceased sibling when he was hospitalized or including the sibling at holiday celebrations. *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1137 (2000).

¶ 33 Willis contends that the circuit court engaged in a "shameful manipulation of the facts" to arrive at its dependency allocation. He claims that "[w]itness after witness that observed Lamariana and Marshana together overwhelmingly testified that there was no evidence of a relationship based on loss of society." The record demonstrates otherwise. Several witnesses gave examples of interactions between the two girls, including hugging, kissing, feeding, and playing. The court specifically relied on the expert testimony of Dr. Hopkins, who explained that even very young children form bonds with siblings. This testimony, and that of other witnesses, sufficed to demonstrate "deprivation of the companionship, guidance, advice, love and affection" as required by *Finley*. Willis counters with his own testimony, in which he repeatedly asserted there was no bond between the two girls. He also relies on similar testimony of other witnesses. But his argument distills down to a plea to reweigh the evidence, which we may not do. See *Adams*, 198 Ill. App. 3d at 356. Based on this record, we cannot say the circuit court abused its discretion in allocating a share of dependency to Lamariana.

¶ 34    Likewise, the court did not abuse its discretion in awarding Lamariana a 40% share as opposed to her father's 60% share. In light of Marshana's very short life and the facts presented regarding Willis's periodic absences from Marshana's home, the circuit court could reasonably have determined that Willis's and Marshana's pecuniary damages were roughly equal, with Willis receiving a slightly larger share.

¶ 35    Affirmed.